## ORDER OF ST. BENEDICT OF NEW JERSEY *v.* STEINHAUSER, INDIVIDUALLY AND AS ADMINISTRATOR OF WIRTH.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 267. Argued March 11, 1914.—Decided June 22, 1914.

In a suit by an ecclesiastical society to recover from the administrator of a deceased member assets of the estate as community property under the provisions of the constitution and membership, the question for the courts is not one of canon law or ecclesiastical polity, but one solely of civil rights.

Where the State has chartered a society as one of "religious men living in community," a provision in its constitution for community ownership, with renunciation of individual rights in private property during continuance of membership, with freedom of withdrawal, is not invalid as opposed to the public policy of, but is directly sanctioned by, the State creating the society.

An agreement to live in community and renounce individual rights of property, but with a right to withdraw at any time invades no constitutional right; nor, in this case, does it transgress any statute of the State of New Jersey which chartered the society with which the agreement is made.

Subject to the inhibitions of the Constitution of the United States the legislature of each State is the arbiter of its public policy.

In this case *held* that an agreement made by a member of a religious order, chartered as a society of religious men living in community, that his individual earnings and acquisitions, like those of other members, should go into the common fund, included his earnings from copyrights of books; and also *held*, that as such agreement contained a right to withdraw at any time there was no infringement of any right protected by the Constitution of the United States nor was it against the public policy of the State of New Jersey which granted the charter to the society.

194 Fed. Rep. 289, reversed.

THE facts, which involve the validity under the laws of New Jersey and the public policy of that State of an agree-

ment between an ecclesiastical order and one of its members, are stated in the opinion.

*Mr. Morgan J. O'Brien,* with whom *Mr. Otto Kueffner, Mr. Albert Schaller, Mr. Frederick C. Gladden, Mr. J. Warren Greene* and *Mr. Frank W. Arnold* were on the brief, for plaintiff in error.

*Mr. William H. Pitzer* and *Mr. William Hayward* for defendant in error.

MR. JUSTICE HUGHES delivered the opinion of the court.

This suit was brought by The Order of St. Benedict of New Jersey, a corporation of that State, to establish its title to personal property left by Augustin Wirth, deceased, a member of the Order who died at Springfield, Minnesota, in December, 1901. The defendant, Albert Steinhauser, as administrator of the estate of the decedent, holding letters from the Probate Court of Brown County, Minnesota, filed a cross-bill asserting ownership in his representative capacity and praying discovery and account with respect to whatever part of the estate had come into the complainant's possession. The Circuit Court entered a decree dismissing the cross-bill and granting the relief sought by the complainant's bill. 179 Fed. Rep. 137. The Circuit Court of Appeals reversed this decree, directing the dismissal of the original bill and the granting of the prayer of the cross-bill. 194 Fed. Rep. 289. Certiorari was allowed.

The monastic brotherhood known as the Order of St. Benedict was established by St. Benedict in the early part of the sixth century at Subiaco, Italy, whence it spread over western Europe. It was brought to the United States in 1846. The members of the brotherhood follow what is known as 'The Rule of St. Benedict,' a collection

of mandates essentially unchanged from the beginning. The vows are those of obedience, stability, chastity and poverty.

We are not concerned in the present case with any question of ecclesiastical requirement or monastic discipline. The question is solely one of civil rights. The claim in suit rests upon the constitution of the complainant corporation, and the obligations inherent in membership.

The Order of St. Benedict of New Jersey was incorporated in 1868 by special act of the legislature of that State. The incorporators were described as 'being a society of religious men living in community and devoted to charitable works and the education of youth.' The corporation was empowered to hold property and to make by-laws for the government of the Order, provided that these should not be repugnant to the Constitution of the United States or of the State of New Jersey, that the clear yearly income of the real estate should not exceed a sum stated, and that no one should remain an incorporator 'except regular · members of said religious society, living in community and governed by the laws thereof.' Under this charter the Order adopted a constitution, among the provisions of which are the following:

"Section XI. Membership is lost at once:

"1. By being dismissed according to the disciplinary statutes of the Order of St. Benedict of New Jersey approved of by Pope Pius IX for the American Cassiness Congregation of Benedictines.

"2. By voluntarily leaving the Order for any purpose whatsoever.

"3. By joining any other order or secret society or any other religious denominations.

"Section XII. Since the Order of St. Benedict of New Jersey is solely a charitable institution, the real estate of said Order and the individual earnings of its members, are and must be considered as common property of the

Order of St. Benedict of New Jersey from which the members of said Order derive their support and the balance of which income and property should serve for following up and carrying out the charitable objects of the Order.

"It is therefore agreed upon by all the members of the said Order of St. Benedict of New Jersey that no member can or will claim at any time or under any circumstances more than their decent support for the time for which they are members of the Charter of the Order of St. Benedict of New Jersey, and no further.

"And, moreover, that each member individually pledges himself to have all property, which he now holds or hereafter may hold, in his own name conveyed as soon as possible, to the legal title of the Order of St. Benedict of New Jersey."

Augustin Wirth was born in Bavaria in 1828. He came to this country in 1851; and, in the next year, he took the solemn vows of the Order at St. Vincent's Abbey in Pennsylvania and was ordained to the priesthood. For a few years he had charge of a church at Greenburgh, Pennsylvania, near St. Vincent's, and in 1857 he went to Kansas where he established a college and a church which afterwards became an abbey. He continued his work in Kansas until 1868 and then was sent to Minnesota where he remained until 1875. He then resumed his pastorate at Greenburgh, Pennsylvania, and later had charge of a parish at Elizabeth, New Jersey, until 1887. It is evident that while in Kansas he had joined the monastery of St. Benedict there established and in 1887, with the permission of both Abbots, he transferred his stability to St. Mary's Abbey in Newark, New Jersey, the home of the complainant, the New Jersey Order, of which he thus became a member. He remained continuously at this Abbey for about two years, until 1889; he was in ill-health and was taken care of by the Order. He was then sent to a church in Wilmington, Delaware, and after a few

months he returned to his pastorate in Elizabeth, New Jersey, in which he continued until 1897. After traveling for some time in Europe for his health, visiting Rome and various monasteries, he took a parish, in 1898, at Springfield, Minnesota, with the requisite permission *ad tempus* from the Abbot of St. Mary's; and there he remained until his death. At the request of the New Jersey Abbot he was buried in the cemetery of the Benedictine Order in Minnesota. The Circuit Court found that his membership in the complainant Order continued to the last, and this finding was not disturbed by the Circuit Court of Appeals. We regard the fact as satisfactorily established. His absence from the Abbey when engaged in pastoral work was upon the consent of the Abbot and he was subject to recall at any time.

Father Wirth published many works on religious subjects. He obtained copyrights for his books, and made his contract with the publishers, in the name of "Augustine Wirth, O. S. B." The property here in question consists chiefly of the proceeds received from sales of these books (including notes and mortgages in which they had been invested), credits on account of sales made before and after his death, and the copyrights. He received the royalties personally during his lifetime; and after his death, until October 17, 1906 (when suit was brought against the publishers by the administrator), the accruing royalties were paid to the complainant. The New Jersey Order also, through the Abbot of St. John's Abbey in Minnesota, collected certain sums on outstanding notes held by the decedent and paid therefrom the decedent's debts.

It is clear that, according to the principles of the complainant's organization, Father Wirth was not entitled to retain for his own benefit either the moneys which he received for his services in the various churches with which he was connected or those which he derived from

the sale of his books. By the explicit provision of the constitution of the complainant (§ XII), it was a necessary consequence of his continued membership, that his gains—from whatever source—belonged to it, and that as against the complainant he could not assert title to the property which he received. The claim of the Order, based upon this conception of its rights, is resisted upon the grounds, (1) that the decedent had the permission of the Abbot to retain, as his own property, the proceeds of the sales of his books, and (2) that the obligation sought to be enforced by the complainant is void as being against public policy.

1. While there was evidence that Father Wirth was required to account to the Abbot for the salary and perquisites received in his church work, it appeared that the income from his books was treated in a different manner. This income he was allowed to retain and use. When he joined the complainant, in 1887, he did not make a transfer of any property to the Order although already he had some property as a result of his literary labors. The evidence showed that he made loans and investments; and from the moneys in his hands, he paid his personal expenses including his outlays on his visit to Europe. Because of his going to Rome without leave and his expenditures on this trip, he was admonished by the Abbot Primate, O. S. B., who had already written to the Abbot of St. Mary's that Father Wirth should be required to account. But no such account was given, and it would seem that such disagreements as arose between the decedent and his ecclesiastical superiors in this country related to church moneys and not to the proceeds of book sales. The Circuit Court of Appeals, disagreeing with the finding of the Circuit Court, concluded that Father Wirth was permitted by the Abbot of St. Vincent's, and by the complainant's Abbot, to retain these proceeds as his own property.

It is undisputed that the decedent did have a special permission with respect to the use of this income. Originally given by the Abbot of St. Vincent's, it was continued by the Abbot of St. Mary's. It was given in recognition of the fact that his literary work was in addition to the duties which he was normally required to perform. But, as we think, the conclusion of the court below does not give proper weight to the testimony as to the nature and scope of the privilege thus accorded. It was explicitly testified by the Abbot that Father Wirth was permitted to keep the moneys in question, not as his own, but to have their use for charitable purposes with the permission of his superiors. It was this permission which was originally given and which the complainant's Abbot renewed. This testimony was not controverted and, in view of the constitution of the Order, we find no ground for treating the permission as being of a different character. It is said that it does not appear how the decedent while in Minnesota, for example, could have expended the money for the charitable purposes of the Order in New Jersey. But the purposes of this Order were broadly charitable and religious; the decedent prosecuted his educational and religious work with the Abbot's consent and the use of these moneys for charitable purposes, wherever he was located for the time, might well be in furtherance of the objects of the Order. It may have been the concession of a special privilege to permit the decedent to act directly in the distribution of the moneys which he had earned by his additional labors, instead of turning them over to the head of the Order, but we cannot say that it was a permission without restriction or one which essentially altered his relation to the Order and his fundamental duty while he remained a member of it.

On the contrary, we agree with the Circuit Court, not only in its finding of fact that the permission was limited as stated, but also in its holding that in view of the basic

law of the organization, there is no warrant for the conclusion that the Abbot had any authority to allow Father Wirth to assert an independent title or to hold the property as absolutely his own.   It is said that the 'Rule of St. Benedict' recognizes the right of the member of the Order to keep whatever the Abbot permits him to have. But this plainly refers to the necessities of life and not to accumulations in direct antagonism to the principles of the society.   Whatever indulgence may have been shown to the decedent with respect to the submission of appropriate accounts, it cannot be said that while his membership continued he had, or could have, the privilege of accumulating an individual estate for his own benefit and free from his obligations to the Order.   This could not but be regarded as violative of the constitution of the complainant and beyond the competency of its official head to grant.

2. We are thus brought to the question whether the requirement, which lies at the foundation of this suit, is void as against public policy; that is, whether, by reason of repugnance to the essential principles of our institutions, the obligation though voluntarily assumed, and the trust arising from it, cannot be enforced.   In support of this view, it seems to be premised that a member of the Order can be absolved from his vows only by the action of the Head of the Church and that unless the requisite dispensation is thus obtained the member is bound for life in temporal, as well as in spiritual, affairs.   This, it is said, is the necessary import of testimony given by the Abbot.   It is thus assumed that the vows in connection with the 'Rule' bind the member in complete servitude to the Order for life or until the Head of the Church absolves him from his obligations; and it is concluded that an agreement for such a surrender, being opposed to individual liberty and to the inherent right of every person to acquire and hold property, is unenforceable in the civil

courts and cannot form the basis for an equitable title
in the complainant.

This argument, we think, disregards the explicit provi-
sion of the complainant's constitution as to voluntary
withdrawal. It overlooks the distinction between civil and
ecclesiastical rights and duties; between the Order of
St. Benedict of New Jersey, a corporation of that State,
and the monastic brotherhood subject to church au-
thority; between the obligation imposed by the corporate
organization and religious vows. As we have said, the
question here is not one of canon law or ecclesiastical
polity. The requirement of complainant's constitution
must be read according to its terms and its validity must
be thus determined. Granted that it is to be examined in
the light of that to which it refers, still, obligations which
are inconsistent with its express provisions cannot be im-
ported into it. This constitution, as already stated, def-
initely provides:"Membership is lost at once:—2. By vol-
untarily leaving the Order for any purpose whatsoever."
(Section XI.) This language cannot be taken to mean
other than what it distinctly says. So far as the corpora-
tion, and the civil rights and obligations incident to mem-
bership therein, are concerned, it leaves no doubt that
the member may voluntarily leave the Order at any time.
His membership in the corporation, and the obligation
he assumes, are subject to that condition. If he severs his
connection with the corporation, it cannot be heard to
claim any property he may subsequently acquire. His
obligation runs with his membership and the latter may
be terminated at will.

With this privilege of withdrawal expressly recognized,
we are unable to say that the agreement—expressed in
§ XII of the complainant's constitution—that the gains
and acquisitions of members shall belong to the cor-
poration, must be condemned. These go to the corpora-
tion in exchange for the privileges of membership and

to further the common purpose to which the members are devoted. No constitutional right is invaded and no statutory restriction is transgressed. The legislature of New Jersey which, subject to constitutional inhibition is the arbiter of the public policy of that State, granted the charter by special act to the Benedictine Society of 'religious men living in community' and it cannot be said that the constitution adopted by the Order was repugnant to the charter provisions or exceeded the authority plainly intended to be conferred. It would seem to be clear that the obligation assumed instead of being opposed to the public policy of the State where it was created was directly sanctioned.

The validity of agreements providing for community ownership with renunciation of individual rights of property during the continuance of membership in the community, where there is freedom to withdraw, has repeatedly been affirmed. The case of *Goesele* v. *Bimeler*, 14 How. 589, related to a religious society called Separatists. By an agreement made in 1819, the members of the society agreed to unite in a 'communion of property.' They renounced 'all individual ownership of property, present or future, real or personal.' Amendatory articles of like import were signed in 1824. As to these agreements, the court said: "The articles of 1819 and 1824 are objected to as not constituting a contract which a court of equity would enforce. . . . What is there in either of these articles that is contrary to good morals, or that is opposed to the policy of the laws? An association of individuals is formed under a religious influence, who are in a destitute condition, having little to rely on for their support but their industry; and they agree to labor in common for the good of the society, and a comfortable maintenance for each individual; and whatever shall be acquired beyond this shall go to the common stock. This contract provides for every member of the

community, in sickness and in health, and under whatso-
ever misfortune may occur. . . .—By disclaiming all
individual ownership of the property acquired by their
labor, for the benefits secured by the articles, the members
give durability to the fund accumulated, and to the
benevolent purposes to which it is applied. No legal ob-
jection is perceived to such a partnership." (*Id.*, pp. 606,
607). In *Schwartz* v. *Duss*, 187 U. S. 8, the controversy
related to the property of the Harmony Society, a com-
munity in Pennsylvania. It was said that the cardinal
principle of the society was 'self-abnegation,' which was
manifested 'not only by submission to a religious head,
but by a community instead of individual ownership of
property, and the dedication of their labor to the society.'
It had been held by the Supreme Court of Pennsylvania
that the agreements constituting the community were
not offensive to the public policy of that State (*Schriber*
v. *Rapp*, 5 Watts, 351), and, as to this, it was said by
this court: "The Supreme Court observed that the point
made against the articles as being against public policy
was attended with no difficulty, and Chief Justice Gibson
said for the court: 'An association for the purposes ex-
pressed is prohibited neither by statute nor the common
law.'" (*Id.* p. 26.) In *Burt* v. *Oneida Community*, 137
N. Y. 346, in describing the character of that society, the
Court of Appeals of New York said that its main purpose
was the 'propagandism of certain communistic views as
to the acquisition and enjoyment of property' and 'the
endeavor to put into practical operation an economic and
industrial scheme which should embody and illustrate
the doctrines which they held and inculcated.' Neces-
sarily, said the court (p. 353), "the basic proposition of
such a community was the absolute and complete sur-
render of the separate and individual rights of property
of the persons entering it; the abandonment of all purely
selfish pursuits, and the investiture of the title to their

property and the fruits of their industry in the common body, from which they could not afterwards be severed or withdrawn except by unanimous consent. It was fashioned according to the pentecostal ideal, that all who believed should be together and have all things common. It was intended to be in fact, as they frequently styled themselves, but a single family upon a large scale with only one purse, where self was to be abjured and the general good alone considered." The court, viewing it solely as a business undertaking, held that the organization 'was not prohibited by any statute or in contravention of any law regulating the possession, ownership or tenure of property.' See also *Speidel* v. *Henrici*, 120 U. S. 377; *Gasely* v. *Separatists*, 13 Oh. St. 144; *Waite* v. *Merrill*, 4 Maine, 102; *Gass* v. *Wilhite*, 2 Dana (Ky.), 170; *State* v. *Amana Society*, 132 Iowa, 304; 8 L. R. A. (N. S.) 909, *note;* 11 Ann. Cas. 236, *note.*

It is said that in these cases, the contracts had been fully performed, and that the effort was made either to partition or distribute the property of the society, or to recover the value of property which had been actually conveyed or services which had been rendered to it. But the validity of the agreements there in question, against the objection based upon public policy, was distinctly recognized.

In the present case, there was no infringement of Father Wirth's liberty or right to property. He did not withdraw from the Order. He had agreed, by accepting membership under the complainant's constitution, that his individual earnings and acquisitions, like those of other members, should go into the common fund and, except as required for the maintenance of the members, should be used in carrying out the charitable objects of the Order. It is not unlikely that the copyrights upon his books derived their commercial value largely, if not altogether, from his membership. Certainly, the equitable ownership of these copyrights, by virtue of his obligation, vested in the com-

plainant and the moneys in question when received became in equity its property and were subject to its disposition. As to both, Father Wirth stood in the position of a trustee.

The further objection that the claim is barred by the statute of limitations was held by the Circuit Court to be untenable and we agree with that view. The applicable limitation is six years (Revised Laws, Minnesota (1905), § 4076,) and the bill was filed within six years after Father Wirth's death. There is no such clear evidence of repudiation of the trust as would warrant the conclusion that the statute began to run at an earlier date.

The decree of the Circuit Court of Appeals is reversed and that of the Circuit Court is affirmed.

*It is so ordered.*