## MAAS *v.* SISTERS OF MERCY OF VICKSBURG *et al.*

(En Banc. March 10, 1924.    Suggestion of Error Overruled April 7,
1924.)

[99 So. 468.    No. 23531.]

1. TRUSTS.  *"Resulting trusts" defined.*
   "Resulting trusts" are trusts deducible from the nature of the
   transaction, although not expressed by the words of the parties,
   and are superinduced upon the transaction by operation of law
   as a matter of equity for the purpose of carrying out the pre-
   sumed intention of the parties in order to protect their rights,
   independent of their intention in fact—(citing 4 Words and
   Phrases, "Implied Trust").

2. RELIGIOUS SOCIETIES.  *Constitution, by-laws, and usages of Sisters
   of Mercy held contract between society and member that mem-
   ber hold property devised to her in trust for society.*
   The constitution, by-laws, and usages of the "Sisters of Mercy,"
   requiring the Sisters to take vows of poverty and obedience, in
   effect depriving the Sisters of all right to own property in their
   individual capacity, and making property acquired by the Sisters
   inure to the benefit of the society, *held* to constitute a contract
   between the society and a member, while the member is enjoy-
   ing the benefits of such membership, under which property de-
   vised to such member shall be held in trust for the society.

3. WILLS.  *Legacies to members of "Sisters of Mercy" held violative
   of mortmain statutes.*
   Legacies to members of "Sisters of Mercy" *held* violative of mort-
   main statutes (Code 1906, sections 5090, 5091, [Hemingway's
   Code, sections 3378, 3379] and Const. 1890, sections 269, 270),
   making legacies to a religious or ecclesiastical society void, in
   view of constitution, by-laws, and usages of the "Sisters of
   Mercy," making the members of the "Sisters of Mercy" trustees,
   for the benefit of the society, of all property acquired by members
   during their membership, since such legacies created a resulting
   trust in favor of the society in violation of the statute.

4. RELIGIOUS SOCIETIES.  *Benefits derived from membership in re-
   ligious society held sufficient consideration for agreement to
   bring all property received during membership into the com-
   munity.*
   Benefits derived from membership in "Sisters of Mercy," consisting
   of home and comfortable support, and care in sickness and death,

were sufficient consideration for members' obligation to bring all property received by them during their membership into the community for the benefit of all.

5. EVIDENCE. *Parol evidence not admissible to contradict constitution and by-laws constituting contract between "Sisters of Mercy" and members.*

Parol evidence that members of "Sisters of Mercy" could and did own property in their individual rights *held* not admissible to contradict constitution and by-laws of the society constituting contract between society and members.

### ON SUGGESTION OF ERROR.

6. RELIGIOUS SOCIETIES. *Wills. "Sisters of Mercy" held a "religious society," within statutes making legacies to religious society void; bequest to religious society, void under statute, goes to heirs at law.*

Under section 270 of the Constitution of 1890, and section 3379, Hemingway's Code (section 5091, Code of 1906), providing that gifts, legacies, and bequests of money or personal property to a "religious society" shall be void when contained in any last will and testament, a will made to the religious society of the Sisters of Mercy, which is a religious and charitable society, is void, and such bequest goes to the heirs at law of the testatrix.

APPEAL from chancery court of Warren county.

HON. E. N. THOMAS, Chancellor.

Suit by Mrs. Ruby V. Maas against the Sisters of Mercy of Vicksburg and others contesting the last will and testament of C. G. Maas, deceased. Decree for defendants, and plaintiff appeals. Reversed and judgment rendered.

*Henry, Canizaro & Henry,* and *H. K. Murray,* for appellant.

We invoked in the chancery court, as we do here, the Statute of Mortmain, under our constitutional provisions, sections 269 and 270, and the Statute Laws, sections 5090 and 5091, Mississippi Code of 1906, and to those sections of the Constitution and to those sections of the Code we now direct our remarks.

For a short historical review of the Mortmain Statute, see Chase's Blackstone (4 Ed.), page 423. The court will observe that among the reasons given against the church taking property by will, we find: (a) That the circulation of landed property from man to man began to stagnate. (b) Taking long leases, one thousand years or so, was an evasion of the law. (c) Fraud and collusion wherein tenants made no defense of suits, was a mischievous and pernicious attempt to defeat the Mortmain Statute. (d) Lands not granted to themselves (the church) directly but to nominal "feoffees" ("Holders" to the use and benefit of religious houses). Quite an ingenious attempt to defeat the law! (e) Purchasing large tracts of land and calling it churchyards. *Flood* v. *Ryan,* 22 L. R. A. (N. S.) 1263, and note.

Thus we find that the testator could not by evasion or subterfuge dispose of his property against his heirs. And so we are admonished that the Sisters of Mercy cannot hold against the heir at law of the deceased, C. G. Maas. *Edwards* v. *Pike* (1775), 1 Eden, 267; *Russell* v. *Jackson* (1852), 10 Hare, 204; *Moss* v. *Cooper* (1861), 1 John & H. H. 352; *Long* v. *Gloyd* 25 Wash. L. Rep. 50; *Blackbourn* v. *Tucker,* 72 Miss. 747.

We are not concerned as to what the deceased, Maas, wanted to do, nor what he intended his attorney to do, nor what his attorney attempted to do. There is a prohibition "against the thing to be done, and not against the process by which it is done." In other words, "the limitation is upon testamentary power."

The Mortmain Law in Mississippi. The court will observe that there has been in Mississippi, an inhibition against one devising property to any religious or ecclesiastical society or denomination as early as the Code of 1857, Mississippi, articles 55 and 56, section 10. There was at that time, no constitutional provision. *Barton, et al.,* v. *King, et al.,* 41 Miss. 288. The people of Mississippi were not content to have the matter of Mortmain merely set out in the statute law of the state, but desiring that

it might be secured for all times, in order that property could not be held by a devise in "dead hands," caused sections 269 and 270 to be written into the Constitution of the state of Mississippi, as will appear in the Constitution of 1890.

The Constitution forbids implied trusts in such a case. In Words and Phrases, Volume Four, page 3436, we find what law writers conceive to be the true definition of implied trust. *Kaphan* v. *Toney* (Tenn.), 58 S. W. 909, 913; *Cone* v. *Dunham,* 20 Atl. 311, 313, 59 Conn. 145, 8 L. R. 647; *Garrell* v. *Alspaugh,* 27 S. E. 85.

A pertinent inquiry would be, who are the Sisters of Mercy? In answer we will say that the very first words of the "Rule and Constitution" are "The Sisters admitted to this religious congregation." So we have a religious society, and as the charter of incorporation provides for rules and regulations, we have rules and regulations of a religious society with which to deal. We find the oath of poverty; we find gifts belong to the community; gifts only received at sanction of Mother Superior (which shows she governs and controls them); the vow of obedience.

How can it then be argued that they, these three Sisters, may have and hold property in fee-simple?

It is perfectly manifest, beyond question, that he wanted the Sisters of Mercy of Vicksburg to enjoy this property after his death, and in order to evade and circumvent the strict mandate of the law, the scrivener attempted to do that which the law absolutely condemns. A case directly in point, with facts and circumstances almost identical, decided by the supreme court of Pennsylvania, is styled: *In Re Stirk's Estate,* 81 Atl. 187, 232 Pa. 98. See, also, *Russell* v. *Jackson,* 10 Hare, 204; *In Re Bickley's Estate,* 270 Penn. 103, 113 Atl. 68.

We say: Item five of Mr. Maas' will creates Miss Emma Daly, Miss Anna Phelan, and Miss Laura Stevens, trustees for and in behalf of the convent. The attention of the court is invited to the case of the *Order of St.*

*Benedict* v. *Steinhauser,* quoted in 58 L. Ed. 1512, 234 U. S. 640. This case was decided by Justice Hughes, now secretary of state. This case, decided by the highest court in the land, is conclusive.

*Hirsh, Dent & Landau,* and *Anderson, Vollor. & Kelly,* for appellees.

I. *We know of no law in this state whereby a party can divest himself or herself of the right to hold, acquire, or receive property by gift, devise, or otherwise, by joining any association, ecclesiastical or otherwise.* As we view this case, the question of the Canon law, ecclesiastical requirements or monastic discipline is not involved. The sole question for this court to determine is: What was the intention of Maas at the time he made the will in question, and who shall take the property devised in item five of the will?

Counsel cite no authorities to show that when a party becomes a member of the Sisters of Mercy, or other society, they become disqualified to hold or take property in this state in their own name by deed, gift, devise, or otherwise. The Canon laws, and the ecclesiastical doctrines of the Catholic Church, are not a part of the law of this state, and, therefore, under the law, cannot affect the rights of the respective parties to this controversy.

II. *Agreement, rule or regulation of any society or organization to divest one from right to hold, acquire, enjoy or dispose of property void as against public policy and the law of this state. Hershey* v. *Clark,* 38 Am. Rep. (Ark.) 5; *Baltimore Humane Impartial Society & Aged Men's & Aged Women's Homes* v. *Elisha Pierce,* 70 L. R. A. 485.

III. *No evidence to show trust was intended or created.* There isn't a scintilla of evidence in this record to show that Maas intended to convey to the Sisters of Mercy, anything. The subject of giving to charity or to the church, so far as this record discloses, was never

mentioned by Maas. On the contrary, Maas states in his will, in no uncertain terms, that it was his intention and his purpose to give, at his death, this property to Miss Daly, Miss Phelan, and Miss Stevens, individuals, and "not to them as members of the Sisters of Mercy, or for the use and benefit of the Sisters of Mercy, or any other charitable or religious corporation or association. The bequest and devise is absolute to the ladies named."

IV. *Authorities cited by counsel not applicable to facts of this case and if so sustain contention of appellees.* See *Flood* v. *Ryan,* 22 L. R. A. (N. S.) 1236. Counsel refer to *St. Benedict Order* v. *Steinhauser,* 234 U. S. 640, in support of their contention. Again, we respectfully submit, counsel err in contending that this case supports their contention.

*Henry, Canizaro & Henry,* for appellant, in reply.

Our contention is that it is not a question of the law of the state by which the Sisters of Mercy are divested of the right of acquiring property of their own. It is the *status* that the Sister assumes, the contractual obligation. That is to say, the Sister has agreed to a community ownership with the renunciation of the individual right in private property during continuance of membership. *Order of St. Benedict of New Jersey* v. *Albert Steinhauser, Adm., etc.,* 234 U. S. 640, 58 L. Ed. 1517. Counsel urge that the constitution of the Sisters of Mercy, the Canon Law, etc., are all incompetent and irrelevant.

We wish to again accommodate our learned friends for the appellee by citing the case of *Order of St. Benedict* v. *Steinhauser, supra.* In that case, as the court may see, the Constitution and by-laws of the order were not only held relevant and competent but the case was decided by the United States supreme court directly under the provisions of the Constitution of the order, where it said: "The agreement expressed in the constitution of a mo-

nastic brotherhood that the acquisition of the members shall belong to the order, is not opposed to public policy."

The case of *Long* v. *Gloyd,* 25 Wash. L. Rep. 50, is another instance where the court held the Constitutional by-laws of the religious organization competent and relevant.

Appellee argues with great force that there is no evidence that Maas desired that the property should go to the institution. We think this is plainly expressed in his entire action and words. When he told Mr. Brunini that he was leaving his property to any three sisters who were there during his wife's sickness, that statement disclosed an intention on the part of Maas to compensate the institution for the services rendered by it and not to any three unknown Sisters of Mercy. There is no possible reason, and it is inconceivable that Maas would will his property to three persons whom he had never met, seen or heard of.

Argued orally by *Pat Henry, Jr.,* and *P. C. Canizaro,* for appellant, and *R. L. Dent,* for appellees.

ANDERSON, J., delivered the opinion of the court.

This was a contest of the last will and testament of C. G. Maas by appellant, his widow, Mrs. Ruby C. Maas, instituted by her in the chancery court of Warren county against appellee Sisters of Mercy of Vicksburg and Misses Daly, Phelan, and Stevens, three of the members of said society, résiduary devisees and legatees under the fifth item of said will.

There was a trial on pleadings and proof, and decree rendered in favor of appellees from which decree appellant prosecutes this appeal.

C. G. Maas died testate, leaving as his sole heir at law his widow, appellant Mrs. Ruby C. Maas. After providing for the payment of his debts and certain specific bequests in the first four items of his will, he undertook

to dispose of the residue of his estate in item 5 in the following language:

"Item 5. All the rest and residue of my estate, real, personal and mixed, I give and devise, in equal shares, unto Miss Emma Daly, Miss Annie Phelan and Miss Laura Stevens, who are members of the order, known as "Sisters of Mercy," in Vicksburg, Mississippi; but on the death of the first of them, her share shall go and survive to the remaining two, and on the death of the second of them, her share shall go to the last survivor, or remaining one of them, in fee simple forever.

"Let it be distinctly known and understood that the bequest and devise to these ladies is to them individually, and not to them as members of the Sisters of Mercy, or for the use and benefit of the Sisters of Mercy, or any other charitable or religious corporation or association. The bequest and devise is absolute to the ladies named.

"Item 6. I desire that my executor shall execute a bond in a surety company authorized to do business in the state of Mississippi, and that he shall make report of his actions hereunder to the chancery court of Warren county, Mississippi.

"Item 7. I hereby nominate, constitute and appoint my friend, John Brunini, the executor of this, my last will and testament."

Appellant contends that item 5 of said will is void because violative of the Mortmain Statutes of this state, sections 5090 and 5091, Code of 1906 (sections 3378 and 3379, Hemingway's Code), which statutes are rescripts of sections 269 and 270 of the Constitution. Said statutes follow:

"3378. Every devise or bequest of lands, tenements, or hereditaments, or any interest therein, or freehold or less than freehold, either present or future, vested or contingent, or of any money directed to be raised by the sale thereof, contained in any last will and testament, or codicil, or other testamentary writing, in favor of any religious or ecclesiastical corporation, sole or aggregate,

or any religious or ecclesiastical society, or to any religious denomination or association of persons, or to any person or body politic, in trust, either express or implied, secret or resulting, either for the use and benefit of such religious corporation, society, denomination, or association, or for the purpose of being given or appropriated to charitable uses or purposes, shall be null and void, and the heir at law shall take the property so devised or bequeathed, as though no testamentary disposition had been made.

"3379.   Every legacy, gift, or bequest, of money or personal property, or of any interest, benefit, or use therein, either direct, implied, or otherwise, contained in any last will and testament, or codicil, in favor of any religious or ecclesiastical corporation, sole or aggregate, or any religious or ecclesiastical society, or to any religious denomination or association, either for its own use or benefit, or for the purpose of being given or appropriated to charitable uses, shall be null and void, and the distributees shall take the property as though no such testamentary disposition had been made."

Appellant contends that the constitution and by-laws of the Sisters of Mercy constitute a contract between the members of said organization by the terms of which the three Sisters of Mercy, made beneficiaries under item 5 of said will, became at most only trustees for the use and benefit of the Sisters of Mercy of the title to the property willed them by said decedent. In other words, that the relationship of said three sisters to said society was such that the effect of item 5 of said will was to create a resulting trust in the estate therein devised and bequeathed in favor of the Sisters of Mercy.

The Sisters of Mercy of the Catholic Church is an organization through which the Catholic Church carries on a large part of its religious, charitable, and educational work. It is a monastic sisterhood, established in Ireland by Catherine McAuley in 1827. Notwithstanding its origin is comparatively recent, the society has extended

its charitable, religious, and educational work over a large part of the earth. The members of this sisterhood, as shown by the evidence in this case, are governed by the constitution, laws, and usages as laid down in the following authorities, which were properly identified at the trial and introduced in evidence: Volume 10, Catholic Encyclopedia, pages 199 to 200; Rules and Constitutions of the Religious Sisters of Mercy, published by the Baltimore Publishing Company, containing 78 pages; Religious Profession, a commentary on a chapter of the new code of canon law by Hector Papi, S. J., Professor of Canon Law, Woodstock College, published by P. J. Kennedy & Sons, New York, containing 81 pages; Catechism of the New Religious Provision, translated from the French, and revised in conformity with the new code.

It will be observed from the constitution and by-laws of the society that, after a given course of service and training preparatory thereto, the Sisters of Mercy take vows of poverty and obedience.

The Sisters of Mercy of Vicksburg was shown by the evidence to be the mother house for all of the other Sisters of Mercy branches in the state. This mother house of the society was chartered in 1861. Among the powers given in its charter are the following: Establishing and maintaining an academy and free school in the city of Vicksburg for the education of female children; "maintaining a house of protection for homeless and indigent females to qualify by training and education for the discharge of such duties as will enable them to procure protection and support;" establishing and maintaining an infirmary, or infirmaries, for the sick. And authority is given the society by its charter to adopt such by-laws, rules, and regulations as may be found necessary for the conduct of its business and affairs. The charter also authorizes the society to own real and personal property to the limit authorized by the laws of this state, and to sell or dispose of same when deemed expedient.

By the vow of poverty the Sisters of Mercy in substance bind themselves to be entirely disengaged from the love of the things of this world; that they will be "content with the food and raiment allowed them, and willing at all times to give up whatever has been allotted to them; that they will not give or receive any present without permission from the Mother Superior, and when, with her permission, they receive any present from their relatives or other persons, it must be considered as for the use of the community and not for the particular use of the receiver. By the vow of obedience they forever renounce their own will and bind themselves to become resigned to and follow the direction of their superiors. The vow concludes with the language that "they shall obey the call of the bell as the voice of God."

The "Catechism of the Religious Profession" defines what the oath of poverty means. In substance it is that it effectually deprives the members of the society of all right to own property in their individual capacity, and places them in a state of material subjection and dependence to their superiors; that any property owned by a sister at the time of profession, as well as any property she may thereafter acquire by legacy, inheritance, conveyance, or otherwise, shall inure to the benefit of the society; that the Sisters of Mercy receiving property shall be deprived of the "use and usufruct of such property as well as of the free and independent disposal thereof; that even the bare legal title cannot be disposed of by the holder thereof without the permission of the governing authorities; that all property owned or acquired by the members of the society shall be community property, that is, the use thereof shall go alone for the benefit of the society; that a Sister shall depend alone on the food, raiment, and support furnished her by the society, which shall be the same as furnished to every member thereof. No member of the society shall have any right to or claim under any circumstances more than her support for the time she is a member. See pages 55,

56, 58, 59, 60, 64, 70, 71, 76, 78, 79, 110. Withdrawal or dismissal from the society is permitted with the approval of the Pope. When withdrawal or dismissal takes place all the property acquired by the Sister during her membership belongs to the society; she takes none of it with her.

Appellant's contention is that this *status* of the Sisters of Mercy makes them trustees for the benefit of the society of all property coming to them in any manner whatever during their membership. In order to determine the question involved, it will be well to have in mind the purpose of the Mortmain Statutes—the evil sought to be remedied—and also the definition of a "resulting trust."

Discussing the first question in *Barton* v. *King,* 41 Miss. 288, this court said, among other things:

"This whole section concerning 'religious societies or congregations,' was designed simply to prevent the evils resulting, as well from the efforts to accumulate vast estates in the hands of the church as from the accomplishment of such an object, and had no reference to the power of testamentary disposition."

And in *Blackbourn* v. *Tucker,* 72 Miss. 747, 17 So. 739, the court said that these statutes had "no relation to the intention of the testator, nor do they regulate the manner in which he may make and publish his will;" that the question was not what was his will, but what was the will of the people as expressed in their Constitution; that manifestly one purpose of the Constitution was to prevent a person who would not be charitable at his own expense from being so at the expense of his heirs. The ownership of property by dead hands is the main thing condemned.

Resulting trusts are those trusts which are deducible from the nature of the transaction, although not expressed by the words of the parties; they are trusts which are superinduced upon the transaction by operation of law as a matter of equity, independent of the particular

intention of the parties. They arise by the operation of
law for the purpose of carrying out the presumed in-
tention of the parties or without regard to their intention
for the purpose of protecting the rights of the parties.
4 Words and Phrases, page 3436, where definitions of
such trust by Story and other writers are given.

Clearly the constitution, by-laws, and usages of the
Sisters of Mercy constitute, so far as they deal with
their civil rights, a binding contract between them, pro-
vided, of course, the Constitution and laws of the state
are not violated. So far as the ownership of property
is concerned, the members of the society are simply
trustees for the benefit of the society. If this is their
*status* with reference to the society, which *status* the
courts would enforce except for our Mortmain Statutes,
then we have clearly a resulting trust, by means of which
if enforced, the Mortmain Statutes would be completely
circumvented. The evidence of Mr. Brunini, decedent's
attorney, draftsman of said will, one of the legatees
therein, and named as executor to carry out its provi-
sions, throws light on the questions involved. He tes-
tified in part:

"Q. Please state to the court, in your own way, just
what transpired when that will was prepared by you;
go into detail. A. Mr. Maas, I suppose you knew, had
been married, I think, three times, when this will was
drawn, and he came to me and asked me to draw his
will, and he told me that there were three Sisters, etc.,
who had paid special attention in nursing his first wife
during his illness. Mr. Maas thought a great deal of
that first wife, and he was always contrasting her re-
lationship to him with his other wives; and he said he
felt exceedingly kind towards those three Sisters, and he
asked me to go out to the convent and find out their
names; that I did, I went up, and made inquiry, and went
back the second time, and they couldn't tell me who
those three Sisters were; those particular ones. This is
a mother house of the Sisters, and these Sisters are sent

out to teach throughout the state; they have different houses in the state of Mississippi, and they couldn't find out just the ones I wanted, as some who were there then were out now. I came back and told Maas; then he told me to go back and get the names of three of the Sisters who were in the convent at that time, at the time his wife was ill, and I did that, and I went back.

"Q. His first wife died? A. Yes, sir, his first wife died; the first wife he married, so far as I know anything about—and so I did that. 'Now,' he says, 'I want to give all my property to those three Sisters,' outside of these other bequests that he had enumerated—one to his niece, one to this negro, Osborn, and he was to leave me five hundred dollars, and he said, 'I want them to enjoy it,' so he instructed me to draw the will, and I did in that regard. I told Mr. Maas—I said, 'These three Sisters, you know, are members of the Sisters of Mercy, and there may be some question about this, and I want to make it positive, and I am going to put in your will that this is given to them individually, and not to the Sisters of Mercy;' and he told me that was exactly the way he wanted it; he was not giving it to the Sisters of Mercy, but to those three ladies.

"Q. Individually? A. Yes, individually.

"Q. I will ask you if item 5 of the will is the item you prepared under these instructions? A. Yes, sir. In fact, I prepared the whole of the will."

As we view it, this question is settled in favor of the contention of appellant by the case of *Order of St. Benedict* v. *Steinhauser,* 234 U. S. 640, 34 Sup. Ct. 932, 58 L. Ed. 1512, 52 L. R. A. (N. S.) 459, Ann. Cas. 1917A, 463.

This was a case instituted by the Order of St. Benedict to establish its title to property left by one of its members, Augustine Wirth. The suit was against Albert Steinhauser, administrator of the estate of said Wirth, who had died. Father Wirth during his lifetime published many works on religious matters, and obtained

copyrights therefor in his own name. The property in controversy consisted chiefly of the proceeds of the sale of these books. It was claimed by the administrator that the decedent had been granted special permission by the abbot of the monastery to retain the proceeds of the sale of his books, and for that reason the administrator was entitled to such proceeds in preference to the Order of St. Benedict. The administrator contended also that the constitution and laws of the Order of St. Benedict were against public policy. The Order of St. Benedict claimed the property in question by virtue of its constitution and by-laws, which it contended, and the supreme court held, constituted a contract binding between Father Wirth and said society covering his civil rights to the copyrights and proceeds of the sale of the books of which he was the author. Members of the Brotherhood of St. Benedict were governed by a collection of mandates known as the rules of St. Benedict.

Those rules prescribed vows of obedience and poverty as well as others. The society was empowered to hold property and to make by-laws for the government of the order not repugnant to the constitution of the United States and of the state of New Jersey. These laws provided that all property should be owned in common, and that no member should receive or own any property in his own right, but it should all go to the Order of St. Benedict for the common good. In other words, it was monastic communistic brotherhood. Each member received a living and a support, and in turn all the earnings and property of each went into the common fund. There was the right of voluntary withdrawal of a member. The court in that case held in substance that a special permission granted by the abbot of a monastic brotherhood to enable a member to retain the use for charitable purposes of the proceeds of his literary labors did not and could not release such member from the agreement expressed in the Constitution and laws of such brotherhood that the gains of the members should belong to

the order, although the rules of the order recognized the right of a member to keep whatever the abbot permitted him to have; that the agreement expressed in the constitution and laws of such a brotherhood that the gains of the members thereof should belong to the order was not opposed to public policy, where the constitution of the order recognized the privilege of withdrawal, and that therefore the order was entitled to all the property left by a deceased member, including that derived from his literary labors; that the equitable ownership of all property acquired by a member of such order belonged to the order; that, as to all property coming to the members of such an order during their membership, the members occupied merely the position of trustees for the order. In brief, the court held in that case that the members of a communistic society could make a valid and binding contract with each other by means of the constitution and laws of such a society, to hold all property coming to them as common to all where there existed to each member the right of withdrawal from such society; and that, as long as one remained a member of such a society, he was bound by its constitution and laws so far as they affected his right to hold property.

It is true that in the present case the right of voluntary withdrawal is not given; it must be with the approval of the highest authority of the Catholic Church. Still it is not necessary to pass on the question whether the members of a communistic society, so far as the rights of property are affected, are bound by its constitution and laws during their lifetime. We hold that, as long as they are members enjoying the benefits derived from such membership, which in case of the Sisters of Mercy consists of a home and comfortable support and care in sickness and death, that is sufficient consideration for their obligation to bring all the property received by them during their membership into the community for the benefit of all. And this means, as will be seen at once, simply that all property coming to

them by legacy, inheritance, conveyance, or otherwise is
held in trust for the common good of the society; and
furthermore, excepting for our Mortmain Statutes, this
would constitute a resulting trust which the Sisters of
Mercy would have the right to enforce in a court of
equity; and the society would have that right, regardless
of what the purpose of the testator was.  Even though
it be true that the testator in this case had no purpose to
violate the Mortmain Statutes, nevertheless, if his will
be given effect the result will be that said statutes will
be as effectually violated as if he had intended to do so.

However, it is argued by appellees that the constitu-
tion and by-laws of the Sisters of Mercy cannot be given
effect as written in this case, because it was shown by
the testimony of one of the Sisters of Mercy (not one of
the appellees, because neither of those testified) and
Father Prendergast that the Sisters of Mercy could and
did own property in their individual rights.  This evi-
dence was objected to on the trial, but the objection was
not ruled on by the court.  It is argued by appellant
that this evidence was not admissible, because it tended
to violate the constitution and laws of the Sisters of
Mercy which constituted a contract between its members
with reference to their property.  This question was
involved and decided in *Order of St. Benedict* v. *Stein-
hauser, supra.*  There the court held that the fact that
Father Wirth had been permitted to receive the fruits of
his literary labors did not affect the contract he had with
the Order of St. Benedict, evidenced by its constitution
and by-laws, which made the fruits of such labors the
property of the order.  The trial court should have ex-
cluded this evidence objected to by appellant.  This was
simply evidence tending to contradict or vary the terms
of the contract by which the members of the Sisters of
Mercy were bound.

Appellees did not offer to show by these witnesses that
the constitution and by-laws of the society providing for

the ownership of property in common had been abrogated.

Something was said in the argument about the court enforcing the laws of religious societies. As said in the case of *Order of St. Benedict* v. *Steinhauser*, we are dealing not with "ecclesiastical requirements or monastic discipline" as such, but the question is solely one of civil rights. It is true that the communistic agreement between the Sisters of Mercy is a law of a religious society; nevertheless it is a law that undertakes and does affect property rights, and in this case it fixes the *status* of the members of this society as long as they are such members, as trustees of all property coming to them in any manner, for the benefit of the society of which they are members.

*Reversed, and judgment here for appellant.*

ON SUGGESTION OF ERROR.

ETHRIDGE, J.

In the suggestion of error it is contended that at least one-half of the personal property owned by the testator at the time of his death must go to the appellees under section 270 of the state Constitution, and that the case of *Blackbourn* v. *Tucker*, 72 Miss. 735, 748, 17 So. 737, sustains this contention.

Section 270 of the state Constitution reads as follows:

"Every legacy, gift, or bequest of money or personal property, or of any interest, benefit, or use therein, either direct, implied, or otherwise, contained in any last will and testament or codicil, in favor of any religious or ecclesiastical corporation, sole or aggregate, or any religious or ecclesiastical society, or to any religious denomination or association, either for its own use or benefit, or for the purpose of being given or appropriated to charitable uses, shall be null and void, and the distributees shall take the same as though no such testamentary disposition had been made."

The same provision is contained in section 3379, Hemingway's Code (section 5091, Code of 1906).

In our former opinion we stated that the appellees were a religious society, but did not enlarge upon that feature of the case. A number of books were introduced in evidence bearing upon this proposition, among which are: volume 10 of the Catholic Encyclopedia, pp. 199, 200; Rules of Sisters of Mercy; Catechism of the Religious Profession; Religious Profession, A Commentary on a Chapter of the New Code of Canon Law, and the New Canon Law.

In the article referred to in the Catholic Encyclopedia it is stated that, after the organization of the society of Sisters of Mercy, a question arose as to whether it should be a religious society, and that a vote was taken and the society unanimously decided to become a religious society.

In the Rules and Constitutions of the Religious Sisters of Mercy, in chapter 1, under heading, "Object of the Institute," we find the following:

"The Sisters admitted to this religious congregation, besides attending particularly to their own perfection, which is the principal end of all religious orders, should also have in view what is peculiarly characteristic of this institute—that is, a most serious application to the instruction of poor girls, visitation of the sick, and protection of distressed women of good character.

"2. In undertaking this arduous, but meritorious, duty of instructing the poor, the Sisters whom God has been pleased to call to this state of perfection should animate their zeal and fervor by the example of their Divine Master, Jesus Christ, who has testified on all occasions a tender love for the poor, and has declared that he would consider as done to Himself whatever should be done unto them."

In section 3, chapter 2, of said Rules and Constitutions of the Religious Sisters of Mercy, it is provided:

"The Sisters shall teach the children to offer their hearts to God when they awake in the morning, adore His

Sovereign Majesty, return Him thanks for all His favors, and arm themselves with the sign of the cross. They shall instruct them how to direct all their thoughts, words, and actions to God's glory, implore His grace to know and love Him, and fulfill His commandments, how to examine their conscience, and respect parents and superiors.''

Section 4 of said chapter 2 provides:

''They shall teach them the method of assisting devoutly at the holy sacrifice of the mass, how to prepare for confession, and shall be ever attentive to dispose them for the sacraments of confirmation and of the holy communion.''

In section 9 of chapter 3 thereof it is provided:

''The Sisters shall always have spiritual good most in view; hence when they find habits have been careless, religious duties long neglected, and coldness and indifference seem to prevail, it is most necessary they should endeavor to create alarm, by speaking of the dreadful judgments of God towards impenitent sinners, and admonishing the patient that, if we do not seek His mercy and protection in the way He has appointed, we must be miserable for all eternity,'' etc.

In said book, Rules and Constitutions of the Religious Sisters of Mercy, second part, chapter 1, we find the following:-

''This religious congregation shall be always subject to the authority and jurisdiction of the diocesan bishop, and the Sisters shall respect and obey him as their principal superior after the Holy See.''

Many other passages could be quoted showing that the promotion of religion is the chief object of the society, but the foregoing is deemed sufficient for that purpose.

Coming, now, to an analysis of section 270 of the Constitution, and section 3379, Hemingway's Code (section 5091, Code of 1906), it is provided that every legacy, gift, or bequest of money or personal property, or of any interest, benefit, or use therein, either direct, implied, or

otherwise, contained in the last will and testament or a codicil, in favor of any religious or ecclesiastical corporation, sole or aggregate, or any religious or ecclesiastical society, or to any religious denomination or association, either for its own use or benefit, or for the purpose of being given or appropriated to charitable uses shall be null and void.

This section prohibits a gift, legacy, or bequest of money or personal property to a religious society, either directly or impliedly, or otherwise. The language of the section is most comprehensive and all-inclusive, and establishes beyond question, it seems to us, that no religious society should receive by or through a will any personal property of any kind. There is nothing in the case of *Blackbourn* v. *Tucker,* 72 Miss. 748, 17 So. 737, *supra,* that held anything contrary to this view. The section does not prohibit a gift, legacy, or bequest of money or personal property to an educational institution not under religious control, as was the case before the court in *Blackbourn* v. *Tucker, supra.* The policy established by this section and the preceding section is clear and explicit, so far as a religious or ecclesiastical society or organization is concerned. The terms of the statute are too clear and plain to admit of any other construction.

The suggestion of error will therefore be overruled.

*Overruled.*