STATE *ex rel.* KNOX, ATTY.-GEN., *v.* SISTERS OF MERCY *et al.*\*

(En Banc. Jan. 23, 1928.)

[115 So. 323. No. 26546.]

(559)

560

*Corpus Juris-Cyc. References: Contracts, 13CJ, p. 411, n. 90; p. 412, n. 4; p. 462, n. 59; Equity, 21CJ, p. 137, n. 13; Religious Societies, 34Cyc, p. 1151, n. 65; p. 1152, n. 71 New; Statutes, 36Cyc, p. 996, n. 4.

*Engle & Laub,* for appellants.

*L. T. Kennedy,* also filed a brief for appellants and argued the case orally.

*F. H. & F. J. Lotterhos* and *Chambers & Trenholm,* for appellants, Frank J. Julienne *et al.*

566

567

*Watkins, Watkins & Eager,* for appellees, Rev. Gerow and Sisters of Mercy.

*Martin & Byrnes,* also filed a brief in behalf of appellee Miss Emma Wood (Sister Imelda).

*Brunini & Hirsch,* for appellees.

Argued orally by *L. T. Kennedy, Chas. F. Engle, F. H. Lotterhos* and *E. L. Trenholm,* for appellant, and *Wm. H. Watkins, W. T. Martin* and *Jno. Brunini,* for appellees.

ANDERSON, J. Appellant, the state, on the relation of the attorney-general, filed its bill in the chancery court of Adams county against appellees the Sisters of Mercy of Vicksburg, Right Reverend Richard Gerow, Bishop of the Catholic Diocese of Natchez, Miss Emma Wood, whose religious name is Sister Imelda, and appellants Frank J. Julienne, Louis N. Julienne, Paul Julienne, Adolph L. Julienne, Harriett Julienne, W. S. Profilet, and Mrs. Louis J. Snelling to escheat to the state a considerable amount of valuable real estate situated in the city of Natchez, upon the ground that it was being held

by the said Sisters of Mercy in violation of the laws and the public policy of this state. Appellees demurred to the bill, which demurrer was by the court sustained. The other appellants, who, for convenience, will be referred to as "the Juliennes," answered the bill and made their answers a cross-bill which cross-bill was demurred to. The court sustained the demurrer to the cross-bill. The result of the action of the court on the demurrers to the original bill and the cross-bill was a decree dismissing the original bill and the cross-bill. From that decree appellant the state prosecutes an appeal, as also do appellants the Juliennes. Pending the litigation a receiver was appointed to take charge of and conserve the property involved. The decree of the court dismissing the original bill and cross-bill discharged the receiver.

The facts in the case are undisputed. They are embodied in the pleadings and the exhibits thereto. It was alleged in appellant's bill as finally amended, substantially as follows: That on the 31st day of October, 1925, Mrs. Mary Q. Botto died intestate, leaving an estate consisting largely of real estate situated in the city of Natchez, in Adams county, in this state. Appellee Miss Emma Wood, known in her religious life as Sister Imelda, Mrs. Botto's nearest of kin (a first cousin), is her sole surviving heir, having been so declared by a decree of the chancery court of Adams county on the 20th day of July, 1926. Appellee the Sisters of Mercy of Vicksburg is a society incorporated under the laws of this state. Miss Wood, or Sister Imelda, was a member. As such she had taken all the vows and obligations required of her by the laws of the society, and of the Catholic Church, of which the Sisters of Mercy is a part, among which are the vows of poverty and obedience, and that all property of whatsoever kind she might acquire in any manner should inure to the benefit of and become the

property of the society, the title thereto to be held by her as trustee for the society. The bill charged that such vows and obligations constituted a binding contract between her and the society of which she was a member, and that this court had so held in *Maas* v. *Sisters of Mercy*, 135 Miss. 505, 90 So. 468.

On the 9th day of August, 1926, appellee Sister Imelda conveyed the larger part of the property of which Mrs. Botto died seized and possessed to appellee Bishop Gerow, and his successors in office, as trustee, to be held and disposed of in trust for the benefit of appellee Sisters of Mercy. That conveyance follows:

"In consideration of the sum of one ($1.00) dollar cash to me in hand paid, and other valuable considerations, the receipt of all of which is hereby acknowledged, I, the undersigned, Emma Wood, known in religious life as 'Sister Imelda,' do hereby remise, release, convey and forever quitclaim unto Right Reverend Richard O. Gerow, Bishop of the Catholic Diocese of Natchez, and his successors in office forever, as trustee, upon the conditions for the purposes hereinafter expressed, the property. . . .

"This conveyance is in trust and for the following purposes and the following conditions:

"First. That the said trustee, or his successor, or successors, in succession, in the office aforesaid, shall, with reasonable dispatch, proceed to sell and convey, either with or without warranty of title, the property herein conveyed, and, as the lots or parcels of land are so sold, the proceeds of sale shall be paid over to the Sisters of Mercy, a body corporate under the laws of the state of Mississippi, and having its domicile at Vicksburg, in said state, using his best judgment and discretion as to the price and terms of sale.

"Second. That, in the meantime, the said trustee shall manage and control said property, either directly, or through an agent, or agents, to be selected by him, and after paying the costs of maintaining said property in a reasonable state of repair, the taxes and insurance thereof, and such other expenses in the handling thereof, as may arise, the proceeds shall be paid over to the said Sisters of Mercy, monthly, quarterly, or semiannually, as he may find it convenient.''

The bill alleged that the real estate conveyed by this deed was held by appellee Sisters of Mercy, in violation of section 934, Code of 1906 (Hemingway's Code 1917, section 4110) ; that the moving reason for such conveyance was the carrying out by appellee Sister Imelda of the vows and obligations taken by her, to hold all property coming into her hands in trust for the society. The bill sought to escheat the property to the state upon the ground that it was being held in violation of said statute. The bill alleged that there was danger of the property being disposed of by appellee Bishop Gerow in carrying out the trust conveyance to him by appellee Sister Imelda. The bill prayed, first for a forfeiture of the property to the state and, in the alternative, that it be sold and the proceeds turned over to those entitled thereto.

Appellants the Juliennes set up in their answer and cross-bill that they were the next of kin to Mrs. Botto, after appellee Sister Imelda; that the latter was a first cousin, and they were second cousins of Mrs. Botto; that they were entitled to inherit the property involved instead of Sister Imelda, for the reason that the latter, by virtue of the vows and obligations taken by her to the appellee Sisters of Mercy to hold all property coming to her for the benefit of such society, thereby divested herself of any right to inherit the property. In other words, that by virtue of such vows and obligations she

had become dead in law and incapable of taking property by inheritance. As stated, the demurrers to the original bill and the cross-bill were sustained.

Section 934, Code of 1906 (Hemingway's Code 1917, section 4110), provides as follows:

"Any religious society or congregation or ecclesiastical body may hold and own, at any one place, the following real property, but no other, viz.:

"(a) A house or tenement for a place of worship;

"(b) A house or tenement for a place of residence for its pastor or minister;

"(c) A house or tenement appropriated and used as a school or seminary of learning for males;

"(d) And another house or tenement to be appropriated and used as a school or seminary of learning for females;

"With a proper and reasonable quantity of ground, in each instance, thereto attached; and

"(e) A cemetery of sufficient dimensions.

"(f) Any religious denomination may, in addition, own such college or seminaries of learning as it may think proper; and

"(g) A place of residence for its local clergyman in charge."

The property involved is in excess of that which, under the statute, appellee Sisters of Mercy was authorized to own and hold. That fact is unquestioned. The position of the state is that property so held by a religious society is forfeited to the state, while appellee Sisters of Mercy contends that no such forfeiture takes place, because none is provided by the statute. *Maas* v. *Sisters of Mercy*, 135 Miss. 505, 99 So. 468, is not authority for the position taken by the state. In that case, the testator devised and bequeathed certain real and personal property to three members of the society of Sisters of

Mercy. The widow and sole heir of the testator contended that in so disposing of the property our Mortmain Statutes, sections 5090 and 5091, Code of 1906 (Hemingway's Code 1927, sections 3578 and 3579), which are rescripts of sections 269 and 270 of the Constitution, were violated. Each of those statutes provides a penalty for its violation. The first section referred to provides, in substance, that all devises or bequests of lands to religious or ecclesiastical societies or associations of persons, either directly or indirectly, shall be void, "and the heir at law shall take the property so devised or bequeathed, as though no testamentary disposition had been made." The second section provides, in substance, that every legacy, gift, or bequest of money or personal property to any such religious or ecclesiastical society or association shall be void, "and the distributees shall take the property as though no such testamentary disposition had been made." The statute here involved contains no provision for forfeiture of title to the property held in violation of it. Does the forfeiture take place in the absence of such a provision in the statute? We think this question is answered in the negative by the decisions of our court as well as the courts of this country generally. The property held by a corporation in excess of that authorized by statute is not forfeited to the state unless it is expressly so provided in the statute. *State* v. *Edward Hines Lumber Co.*, 106 Miss. 780, 64 So. 729; *Quitman County* v. *Stritze*, 70 Miss. 320, 13 So. 36; *Taylor* v. *Alliance Trust Co.*, 71 Miss. 694, 15 So. 121; *Middleton* v. *Georgetown Mercantile Co.*, 117 Miss. 134, 77 So. 956; *Wall* v. *Darby*, 132 Miss. 93, 95 So. 791; *People* v. *Stockton*, 133 Cal. 611, 65 P. 1078, 85 Am. St. Rep. 225; *Commonwealth of Pa.* v. *Railroad Co.*, 132 Pa. 591, 19 A. 291, 7 L. R. A. 634; *Collins* v. *Doyle's Executor*, 119 Va. 63, 89 S. E. 88;

*West Virginia* v. *Baptist Home Mission,* 96 W. Va. 447, 123 S. E. 440; 37 A. L. R. 200; *Union Bank* v. *Matthews,* 98 U. S. 621, 25 L. Ed. 188, 10 R. C. L. 607, 608.

It was held in *Maas* v. *Sisters of Mercy, supra,* that the constitution and by-laws of the Sisters of Mercy, requiring the members thereof to take vows of poverty and obedience, depriving them of the right to own property in their individual capacity, and making any property acquired by them inure to the benefit of the society, constituted a binding contract between the society and its members, while such members enjoyed the benefits of their membership, and that any property devised to a member of the society was thereby held by her in trust for the society. The state contends that under the authority of that case appellee Sister Imelda held the property here involved in trust for the benefit of appellee Sisters of Mercy. In other words, that the appellee Sisters of Mercy became the owner of the beneficial interest in the property, there being nothing outstanding except the bar legal title in the appellee Sister Imelda. We do not decide whether that be true or not, but if it were true, by chapter 194 of the Laws of 1926 (Hemingway's Code 1927, section 4525) the title to the property in appellee Sisters of Mercy was ratified and confirmed. It is provided, among other things in that statute, that the title to all real property now owned by any religious society, ecclesiastical body, or any congregation thereof, "be and the same is hereby validated and such society, body or congregation is authorized and empowered to continue to own the same or to convey or encumber the same." There is no constitutional objection to such a statute. It violates neither section 87 nor 88 of the Constitution. The legislature could have authorized in advance the ownership by religious societies any amount of real and personal property whatsoever, except such as might come

to them by devise or bequest, which is prohibited by the Mortmain provisions of our Constitution and by the statutes enacted in pursuance thereof, as above shown. Furthermore, even if it be true that, under the authority of the Maas case, appellee Sister Imelda took the property involved as a mere trustee for appellee Sisters of Mercy, and if there were no statute confirming the title thereto in the latter, still there would be no forfeiture of the property to the state, as shown by the authorities already referred to. Appellee Sisters of Mercy would own the property with the right to convey it, although the title would be a defeasible one at the instance of the state. The state could force a sale of the property, but it could not take it from them.

The curative statute (chapter 194, Laws of 1926 [Hemingway's Code, 1927, section 4525]) was passed before the execution of the deed by appellee Sister Imelda to appellee Bishop Gerow, by the terms of which the property involved was conveyed by the former to the latter in trust for the appellee Sisters of Mercy, The conveyance was made August 9, 1926. The statute went into effect March 15, 1926. Therefore the curative statute could have no effect on the title of the property acquired by appellee Sisters of Mercy by virtue of that conveyance. By that conveyance appellee Sisters of Mercy got the beneficial interest in the property. Appellee Bishop Gerow was a mere trustee for the benefit of the society. It is true, as stated, the property was in an amount in excess of that authorized by the statute to be held by appellee Sisters of Mercy, but as shown above, under the law no forfeiture resulted by reason thereof to the state, because the statute provided for none. Appellee Sisters of Mercy held a defeasible title to the property, it is true, but such a title it could convey.

It seems that what has already been said would preclude any right of appellants the Juliennes to inherit the property involved from the deceased, Mrs. Botto. Restrictions imposed by law upon a corporation as to the amount of property it may hold cannot be taken advantage of collaterally by private persons, but only by direct proceedings by the state which created the corporation. This principle applies to the next of kin as well as all other persons. *Jones* v. *Habersham,* 3 Woods, 443, Fed. Cas. No. 7465 (U. S. Circuit Court, 5th Circuit); *Id.,* 107 U. S. 174, 2 S. Ct. 336, 27 L. Ed. 401.

We do not think there is any merit in the contention that if the state is not entitled to have the property involved forfeited to the state it has the right, under the allegations of the bill in this case, to retain jurisdiction over the trustee and force a speedy sale of the property. The conveyance from appellee Sister Imelda to appellee Bishop Gerow took place on the 9th day of August, 1926. Within thirty days thereafter the bill in this case was filed by the state. Its scope and purpose was not to force the execution of the trust by the trustee in that conveyance. The bill had no such object. It charged no breach of trust by the trustee. There is no intimation in the bill that the trustee would not speedily execute the trust according to the terms of the conveyance. On the contrary, it was alleged in the bill that appellee Bishop Gerow, the trustee, was proceeding to carry out the trust and convert the real estate into money and turn the proceeds over to appellee Sisters of Mercy, and unless restrained, he would accomplish that purpose. Under the law that is all the state had the right to ask. If the trustee should fail to carry out the trust by converting the real estate into money with reasonable expedition, it will be time enough for the state to move.

*Affirmed.*

PACK, J., took no part in this decision.

ETHRIDGE, J. (dissenting). I am unable to agree with the statements made in the opinion of the majority of the court. I would not dissent were the opinion limited, as in my judgment it should be, to holding that the society was not authorized to hold the land embraced in the trust conveyance, and if the court had announced that it was the duty of the trustee to forthwith convert the land by sale into money. I will set forth my views upon the question, for I do not believe that the pronouncement, in some aspects of the case, in the majority opinion is anything more than *obiter dictum*.

I think Miss Wood, known in her religious life as Sister Imelda, was the sole heir of Mrs. Botto, that she inherited the property which Mrs. Botto owned at her death, and that there was no passage of the title to this property from her to the society; that she was the owner of the property in her own right at the time she executed the trust deed to the Bishop of the Natchez Diocese, but, because of the relations under the laws of the society and of the Roman Catholic Church, whose instrumentality the society is (to be hereafter noticed in this opinion), the bishop was not a suitable person to act as trustee in the said deed, because under the laws of the society and of the Roman Catholic Church both the grantor and the grantee were under duty to implicitly obey the bishop in all respects, and were not in position to challenge any action which the bishop might take with reference thereto. Under the trust deed there was a discretion left with the bishop as to when and upon what terms and conditions he would sell the property. In the meantime, he was to collect the rents from the property and appropriate same to the use of the society.

There is no such thing in the laws of this state as civil death, and notwithstanding the membership of Sister Imelda in the Sisters of Mercy and her vows and obligations thereunder, she is capable of holding and transmitting the property by descent or deed.

I do not understand the opinion of the court in *Maas v. Sisters of Mercy,* 135 Miss. 505, 99 So. 468, to hold that the contract between one of the sisters entering such society and the society, is a legal and valid contract. It was and is my understanding of the opinion that the result there stated would result, were the contract a legal and binding one; but as it was not a legal contract, because of the Mortmain Statutes (sections 269 and 270 of the Constitution of 1890), the illegality of the contract was clear and free from doubt. The features of the contract, which in my judgment render it illegal and contrary to public policy, were not there entered upon, nor were they fully discussed either in the briefs of counsel or in the opinion of the court; and certainly it was not adjudicated that such contract is a legal and binding contract, having a legal effect to at once transmit all property received by a member of the Sisters of Mercy to the society. In the contract in that case, and in the exhibits in the present case, it is clearly shown that an essential condition of a woman entering into that contract is that she assume the vows of poverty, chastity, and obedience, which, under the laws of the society, sanctioned by the authorities of the Roman Catholic Church, pledges the member to forever forego marriage, and to obey without question orders of every kind of her superiors, the Mother Superior of the society, and above her the bishop of the diocese, and above him the society of the religious at Rome, and above that the Pope.

In the Declaration of Independence announcing the principles upon which all of the American common-

wealths are founded, as well as the Constitution and government of the United States, it was solemnly declared:

"That all men, are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."

By the Fourteenth Amendment to the Federal Constitution, it is provided:

"Nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

By the Thirteenth Amendment to the Federal Constitution and section 15 of the state Constitution, it is provided that:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

By section 24 of the state Constitution it is provided that:

"All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay."

By section 25 of the state Constitution it is provided that:

"No person shall be debarred from prosecuting or defending any civil cause for or against him or herself, before any tribunal in the state, by him or herself, or counsel, or both."

The same right is secured in criminal cases by section 26 of the state Constitution.

The word "liberty," as used in the Fourteenth Amendment to the Constitution of the United States, has been discussed by the supreme court of the United States in a number of cases, and, it is clear from the cases dealing with the subject that no contract is valid which infringes upon these rights.

In the case of *Pierce* v. *Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468, the court held that a state statute requiring all children between the ages of eight and sixteen years to attend the public schools unconstitutionally interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. At page 1078 of the L. Ed. (268 U. S. 534, 45 S. Ct. 573), it is said:

"Under the doctrine of *Meyer* v. *Nebraska,* 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446, we think it entirely plain that the act of 1922 [Laws Or. 1923, p. 9] unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the state. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

In the case of *Meyer* v. *Nebraska,* above referred to, the court held that the liberty guaranteed by the Fourteenth Amendment to the federal Constitution "denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of

the common occupations of life, to acquire useful knowledge, to marry, establish a home, and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.''

In the Meyer case the plaintiff in error was tried and convicted in the district court of Hamilton county, Neb., under an information which charged that on May 25, 1920, while an instructor in Zion parochial school, he unlawfully taught the subject of reading in the German language to Raymond Parpart, a child of ten years, who had not attained and successfully passed the eighth grade. The information is based upon ''An act relating to the teaching of foreign languages in the state of Nebraska'' (Laws Neb. 1919, chapter 249), which provided that ''no person, individually or as a teacher, shall, in any private, denominational, parochial or public school, teach any subject to any person in any language [other] than the English language'' (section 1); that ''languages, other than the English language, may be taught as languages only after a pupil shall have attained and successfully passed the eighth grade as evidenced by a certificate of graduation issued by the county superintendent of the county in which the child resides'' (section 2). Other sections provide for the punishment for violation of the act.

In discussing the liberties of a citizen within the meaning of the Fourteenth Amendment, the court said:

''While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up

children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men'' (citing numerous cases).

In *Allgeyer* v. *Louisiana*, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832, the court had under consideration the validity of a statute of the state of Louisiana which prohibited the obtaining of insurance from insurance companies not authorized to do business in that state, and the liberty of contract under the Fourteenth Amendment was involved in that contest. The court discussed the word ''liberty'' (page 431 of 17 S. Ct. [165 U. S. 589]) as follows:

''The 'liberty' mentioned in that amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.''

The court in the opinion quoted also from *Butcher's Union Slaughterhouse Co.* v. *Crescent City Live-Stock Landing Co.*, 111 U. S. 746, at page 762, 4 S. Ct. 657, 28 L. Ed. 585, as follows:

''The right to follow any of the common occupations of life is an inalienable right; it was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen.''

The court in its opinion further quoted from page 764 of 111 U. S. and page 658 of 4 S. Ct. as follows:

"I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

And again:

"But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen."

The court also quoted in that opinion from *Powell* v. *Pennsylvania,* 127 U. S. 678, 684, 8 S. Ct. 992, 995 (32 L. Ed. 253), as follows:

"The main proposition advanced by the defendant is that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property is an essential part of his rights of liberty as guaranteed by the Fourteenth Amendment. The court assents to this general proposition as embodying a sound principle of constitutional law."

The exhibits to the bill in the case before us show that in order to take the vows, which it is admitted by the demurrer that Miss Wood, known in her religious life as Sister Imelda, too, she agreed to surrender absolutely her independent judgment to the judgment of her superiors, to implicitly obey them, and to remain forever chaste. In other words, the exhibits show that she contracted to surrender her individual judgment, her right to marriage, and her right to own or control property as her own mind might incline or dictate to her to do; that this was a primary and essential obligation on entering into that society; that she agreed to hold her prop-

erty subject entirely to the direction of her superiors, and to apply it to such uses as they should designate; that as a consideration for her making this agreement, and the further agreement to render such service as her superiors demanded of her, she was to be given such support as her superiors saw proper to give her; that there was no stipulation in the contract for any specific standard of living, or any specific amount which would be assigned to her for her support. It was shown that she completely surrendered herself to the control and direction of the society with no return except a mere living, and that she agreed that any and all property she might acquire—at any time or in any amount—should be divested out of her to or for such person or institution as to her superiors might designate.

This contract is clearly illegal and cannot be enforced in any court. It is a well-known principle of law that the court will not uphold a part of a contract unless it can uphold the contract throughout. This agreement therefore is clearly in violation of the public policy and laws of this state, and cannot operate to transfer to the Sisters of Mercy the property acquired by her through inheritance from Mrs. Botto.

The bill, however, avers, and the demurrer admits, that the title to the property was confirmed in Miss Wood, known in her religious life as Sister Imelda, by a decree of the chancery court dated July 20, 1926, and that it was therein recognized that Miss Wood was the legal and equitable owner of the complete title. Indeed, the defendants Sisters of Mercy, Bishop of the Natchez Diocese, and Miss Wood filed an answer admitting that the title was confirmed in Miss Wood on said date; denying that she had conveyed the property to the Sisters of Mercy; denying that her vows were solemn vows within the meaning of the Canon Law, which law is controlling in the Roman Catholic Church; and denying that she was incapacitated under the rules and regulations of such so-

ciety to hold the property. But this answer was later withdrawn, and a demurrer admitting the allegations of the bill, entered. Therefore the alleged curative act passed by the legislature of 1926 would have no operation upon the title of the property here involved.

It is a well-settled principle of law in this state that all contracts which are in violation of law or public policy, or which grow out of an immoral transaction, are void. *Brien* v. *Williamson*, 7 How. 14; *Wooten* v. *Miller*, 7 Smedes & M. 380; *Odineal* v. *Barry*, 24 Miss. 9; *Hoover* v. *Pierce*, 26 Miss. 627; *Deans* v. *McLendon*, 30 Miss. 343; *Bank* v. *Stegall*, 41 Miss. 142; *Barker* v. *Justice*, 41 Miss. 240.

In *Green* v. *Robinson*, 5 How. 80, and *Brien* v. *Williamson*, 7 How. 14, it was held that contracts for the purchase of slaves introduced into this state as merchandise, or for sale, since the 1st day of May, 1833, are void, because the provision of the Constitution of this state in relation to slaves so introduced is *per se* a prohibition of such a traffic.

In *Natchez* v. *Trimble*, Walk. 376, it was held that a note given to the city of Natchez for port duties to be collected is in violation of the act of Congress admitting this state in the Union, and is illegal and void.

In *Jackson* v. *Bowman*, 39 Miss. 671, it was held that a contract which obliges one of the parties to do an act in violation of law, or restricts the free exercise of a discretion vested by law in a public or municipal officer, in reference to a trust imposed on him, or which contemplates such violation of law or destruction of the free exercise of a public duty, is a nullity.

In *Whatley* v. *Hughes*, 53 Miss. 268, it was held that a contract by which one agrees, for the purpose of collecting a claim against an estate, to administer thereon, and thereby make the collection, and for his services to retain one-half the amount collected, is immoral, against public policy, and, while executory, is incapable of enforcement.

In 6 R. C. L. 701, it is said:

"A contract directly and explicitly prohibited by a constitutional statute in unmistakable language is absolutely void. That has never been judicially doubted, and is unanimously conceded. To hold such a contract binding would be to enforce that which. the legislature has forbidden, to give effect to that which the legislature has declared void—the repeal of a law by judicial construction. However, it is not necessary that there should be an express prohibition in a statute to render void a contract made in violation of it."

In 6 R. C. L. 707, section 114, it is said:

"The common law will not permit individuals to obligate themselves by a contract either to do anything which, or not to do anything, the omission of which is in any degree clearly injurious to the public. Perhaps no one would at present deny the right or the propriety of judicially determining that a contract which is actually at war with any established interest or society is void, however individuals may suffer thereby. Because the interest of individuals must be subservient to the public welfare. If a contract is of such a nature that it cannot be carried into execution without reaching beyond the parties and exercising an injurious influence over the community at large, every one has an interest in its suppression, and, from a due regard to the public welfare, it will be declared void. The question whether a contract is against public policy must be determined by its purpose and tendency, and not by the fact that no harm in fact results from it. Contracts which are void at common law because they are against public policy like contracts which are prohibited by statute are illegal as well as void, and will not be enforced."

In 13 C. J. 410, section 339, it is stated:

"An illegal agreement will not be enforced, and hence is not a contract, according to the definition of a contract. The illegality may be found in the matter of the

consideration or of the promise as expressed in the agreement, or it may be found in the purpose to which the agreement, although legal in expression, is applied. In either case, the agreement is void. The expression 'void' as used in this connection has the meaning of not affording legal remedy rather than of absolute nullity, since such contracts, when executed, may be indirectly effective in that no relief will be granted to either party.''

In section 341 of the same work it is said:

''Agreements in violation of positive law are those which are expressly or impliedly prohibited either by some rule of the common law, or by some express statutory provision. The cases, however, are likely to lap over and to stand sometimes on one side, sometimes on the other, and sometimes on both sides of this imaginary line. As a general rule, all contracts or agreements which involve or have for their object a violation of the law are illegal. It is immaterial, as far as the effect of the illegality is concerned, whether the object of the agreement is forbidden by the common law or by statute, or, generally speaking, whether the thing forbidden is *malum in se* or merely *malum prohibitum,* although there are authorities which, while not denying that the general rule that an illegal contract cannot be enforced applies as well to contracts *malum prohibitum* as to those *malum in se,* hold that it does not necessarily follow that all of the consequences which attend a contract contrary to public morals, or founded on an immoral consideration, attend and affect a contract which is *malum prohibitum* merely, and that in the latter case the court will take notice of the circumstances and will give relief, if justice and equity require a restoration of money or property received by either party thereunder.''

As stated above, the contract was in restraint of marriage, that is, an agreement to live a life of chastity as interpreted by the Roman Law; restraint of marriage not merely for a temporary period or to a particular per-

son, but for all time and all persons. Marriage is favored by public policy, and all contracts in restraint of marriage are void.

In 6 R. C. L. at p. 768, section 174, it is said:

"There is no provision, either by statute or at common law, which enjoins upon any particular person the duty to marry. To marry or not to marry is left to the free choice of all who are eligible to marriage. As the law does not oblige anybody to marry, but leaves a free agency in that respect to every member of the community, an agreement in restraint of marriage is not an agreement to omit what the law commands, but an agreement to omit what the law leaves to every one's own choice to omit if he pleases. Nevertheless the fact that the law does not punish celibacy is deemed to be an insufficient reason for upholding agreements not to marry. The courts, it is declared, should not countenance an agreement whereby a person absolves himself from even a moral duty to society. Marriage is regarded as a duty of the greatest importance to society, because the failure to marry must result either in immorality or depopulation. It is true that, since to omit to marry is not illegal, it may be difficult to see any good reason for denouncing such a contract as illegal in the sense of violating any law, or of placing parties who may have entered into it outside the pale of the law. It is clear, however, that no legal right can be founded on the promise and no remedy afforded for its breach. In order that the agreement may be invalid, it is not necessary there shall be positive prohibition. It has been said that if the condition is of such nature and rigidity in its requirement as to operate as a probable prohibition, it is void."

In 13 C. J. 462, section 404, it is said:

"A class of agreements which are frequently held invalid on the ground of public policy are agreements affecting marital relations. Chief among these are agreements in restraint of marriage. Restrictions on marri-

age are contrary to public policy, and therefore agreements or conditions creating or involving such restrictions are illegal and void. Thus, where a man agreed to pay a woman a certain sum of money if he married any one but her, the agreement was held void. And so it has been held of a contract or wager by a person that he will not marry within a certain number of years, and of a marriage benefit certificate which was in fact an agreement to pay a sum of money to another on condition that the payee should not marry within a certain time, and if he should marry, then to pay a certain sum for the period that he should remain unmarried. So a contract by a man to pay a woman a sum of money in case she shall marry him after he has secured a divorce is invalid.''

The exhibits to the bill and the allegations of the bill clearly and conclusively show that the contract was in violation of public policy. Public policy is the policy of the state, and not the policy of the Roman Catholic Church. However important it may be for their purposes as an ecclesiastical policy, it is contrary to the principles of the Constitution of the state and of the United States, and is in derogation of the rights of the citizen and void, as these cases will show. It is therefore manifest that the society acquired no title, legal or equitable, to the property inherited by Miss Wood from Mrs. Botto.

The opinion of the majority, while pretermitting a decision of the constitutionality of the act (chapter 194, Laws of 1926), state that there is no constitutional objection to this statute. I think there is constitutional objection to the statute, and that this statement should not be made as it is not necessary to a decision of the case, and the court does not decide the case upon any theory that the contract is ratified by such statute. I think the statute is clearly void, under our Constitution.

Section 87 of the Constitution provides that:

"No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, or where the relief sought can be given by any court of this state; nor shall the operation of any general law be suspended by the legislature for the benefit of any individual or private corporation or association, and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted."

Section 88 of the Constitution provides that:

"The legislature shall pass general laws, under which local and private interests shall be provided for and protected, and under which cities and towns may be chartered and their charters amended, and under which corporations may be created, organized, and their acts of incorporation altered; and all such laws shall be subject to repeal or amendment."

Both the Sisters of Mercy and the Diocese of Natchez are private, charitable, and religious corporations. They are not public corporations, but private corporations. The legislature has provided general laws under which such societies may be chartered, and their charters amended. They are strictly private corporations subject to the provisions above cited in the Constitution. In determining whether a law is local or general, the form of the statute is not controlling, but the court will look to the substance of the law and determine its true character from its substance rather than its form. *Toombs v. Sharkey,* 140 Miss. 676, 106 So. 273. The court, in the first syllabus of that case, said:

"In determining whether a law is general or local or special in violation of Constitution 1890, section 90, its substance rather than its form will be considered."

It was held in that case that chapter 211 of the laws of 1924, providing greater compensation for prosecuting attorney in counties having "assessed valuation of twenty-five million dollars or more," and being "in a

levee district, where a cotton tax is imposèd for levee purposes," than in other counties having same valuation, constitutes a local law, and so violates Constitution 1890; the classification having no reasonable basis. The act there involved had the form of a general law, but inasmuch as it could not have operation throughout the territorial area of the state, it was held to be unconstitutional and void.

In *Yazoo & Mississippi Valley R. R. Co.* v. *Southern Ry. Co.*, 83 Miss. 746, 36 So. 74, this court held that a law which undertook to authorize one of the railroads to purchase a competing line in violation of the general law was a local law, within the purview of section 87; and also held that the clause in section 87, "nor shall the operation of any general law be suspended by the legislature for the benefit of any individual or private corporation or association," was violated, and that it was immaterial in what form the legislature passed the law.

Under the general law, corporations of the kind here involved can only hold certain property therein enumerated, *"but no other,"* section 4524, Hemingway's Code 1927 (section 934, Code of 1906).

The effect of the alleged curative statute is not to amend the law and give it a retroactive effect as to all corporations of the same kind, but merely to authorize such religious and charitable corporations as have acquired property in violation of law, to keep it. The effect of the amendment is not to permit all corporations to acquire property of a given kind and amount for the uses of such society, but merely to condone the violation of law by these societies and institutions. It is, therefore, the same in its effect as if a separate act was enacted in each case, authorizing each specific corporation to acquire and own specific property. Under the terms of the act, no other corporation is authorized to acquire business and residence property for rental and business purposes, and to use or rent them for the use of the so-

ciety, but it is to give a particular corporation this particular right in this particular case, and to give another corporation a particular right as to other kinds and character and amounts of property for its particular purpose and use. It appears too clear for doubt that the legislature could not have done this under the above-named sections of the Constitution, and as it could not do so directly the legislature cannot ratify its legal act and make it legal in utter violation of the true spirit and purpose of the above sections of the Constitution. The law so construed permits one corporation to have, own, and use property for its purpose which another corporation in precisely the same situation cannot acquire for its use and purpose. This renders the law unequal, and gives preference to those who violate the law over those who observe it—an unfortunate position to place the legislature in, and even more unfortunate for those who have disobeyed the law. If any class of corporations should observe the law, it would be the churches and religious institutions whose existence is primarily for the purpose of teaching the people uprightness of living and observance of law and order as institutions ordained of God.

No authority has been cited in the majority opinion for the statement that such statute is not subject to constitutional objection.

The principle of retroactive laws and the legislative power to enact them to cure defects is discussed in Cooley's Constitutional Limitations (8 Ed.) 770 *et seq.* It is stated on page 772 of this work that:

"There is no doubt of the right of the legislature to pass statutes which reach back to and change or modify the effect of prior transactions, provided retrospective laws are not forbidden *eo nomine,* by the state Constitution, and provided, further, that no other objection exists to them than their retrospective character. Nevertheless, legislation of this character is exceedingly liable to abuse; and it is a sound rule of construction that a

statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively. And some of the states have deemed it just and wise to forbid such laws altogether by their Constitutions.

"A retrospective statute curing defects in legal proceedings where they are in their nature irregularities only, and do not extend to matters of jurisdiction, is not void on constitutional grounds, unless expressly forbidden. Of this class are the statutes to cure irregularities in the assessment of property for taxation and the levy of taxes thereon; irregularities in the organization or elections of corporations; irregularities in the votes or other action by municipal corporations, or the like, where a statutory power has failed of due and regular execution through the carelessness of officers, or other cause; irregular proceedings in court, etc.

"The rule applicable to cases of this description is substantially the following: If the thing wanting or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the legislature might have dispensed with by prior statute, then it is not beyond the power of the legislature to dispense with it by subsequent statute. And if the irregularity consists in doing some act, or in the mode or manner of doing some act, which the legislature might have made immaterial by prior law, it is equally competent to make the same immaterial by a subsequent law:"

At page 790 of the same work, after discussing the various applications of the principle of the curative statute, the author says:

"But the healing statute must in all cases be confined to validating acts which the legislature might previously have authorized. It cannot make good retrospectively acts or contracts which it had and could have no power to permit or sanction in advance."

As stated above, it is too clear for dispute that the legislature could not have conferred on these particular

corporations the power to own individually such individual and specific property as they had acquired in violation of law. To do so is clearly to suspend a general law for the benefit of individuals and corporations in violation of these sections. If the legislature can do what is claimed for it in the majority opinion, then the restrictions on the legislature in local private legislation are vain and worthless.

The majority opinion also holds, and cites a number of cases in support of its holding, that a corporation acquiring property in violation of the statute, when discovered with the property can defeat the state's action and retain the proceeds of its wrongful conduct. The cases cited in the majority opinion have no bearing on the suit of the state for the purpose of escheating property held by corporations in violation of the prohibitions of the statute, and the statement is unsound and is not supported by authority.

In *State ex rel. Atty.-Gen.* v. *Edw. Hines Lbr. Co. et al.*, 106 Miss. 780, 64 So. 729, the court simply held that the statute which the attorney-general relied on did not apply to a foreign corporation; that a foreign corporation was not limited in the amount of lands it could hold; that the statutory limitation applies only to domestic corporations; and that the state therefore escheat the property held in violation of the statute. The other cases, without taking up and particularly analyzing them, were not suits by the state for this purpose, but were suits by individuals seeking to nullify the conveyances on that ground. There is a marked distinction between the right of the state and the right of individuals to raise the question.

It is well settled that no one except the state can raise such a question, but the state can raise it. I submit that at common law and by authority in this state, when the state has filed a proceeding to escheat to it, the state has the right to do so, and a corporation is not permitted to answer the state's suit by selling the property, taking the

money, and, as soon as the state's officer withdraws, reinvest it in other property which it is forbidden to hold. I submit that the case of *Wisconsin Lbr. Co.* v. *State of Mississippi ex rel. James L. Gillespie, Land Commissioner,* 97 Miss. 571, 54 So. 247, holds that at common law the property was subject to forfeiture, and that it is not necessary that the provision for forfeiture be expressly placed in the statute. The opinion in the Wisconsin case was written by the author of the majority opinion herein, and, at page 597 of the Mississippi report (54 So. 249), of that case, said:

"In the act of 1877 [Laws 1877, chapter 14] it is against any person being 'allowed to enter more than two hundred and forty acres of land,' etc. In section 2465 [Ann. 1892, section 2564] it is against the ' "purchase" by one person of more than one quarter in one year.' 'Enter' and 'purchase' in these statutes are convertible terms. The penalty added to section 2564, that 'all lands acquired, directly or indirectly,' in violation of law, 'shall escheat to the state,' is the 'universal penalty for the violation of such statutes, whether expressed or not.' If not written in the statute, the law writes it there."

What appears to me to be the true doctrine is announced in *Louisville Ins. Co.* v. *Commonwealth,* 147 Ky. 72, 143 S. W. 1044. At page 1046 of the S. W. Report (147 Ky. 76) the court said:

"Notwithstanding its holding of the real estate escheated more than five years, appellant might at any time before the institution by appellees of this action have protected it against escheat by a *bona-fide* sale thereof to a purchaser for value, but, having failed to do so, it will not be allowed, after the escheat is declared, to escape the consequence of its violation of the law in illegality holding the property by offering to pay the costs of the action, if permitted to sell the property and retain the proceeds. Such a state of case as is here presented was in the minds of the court when it said in the

opinion of *Louisville School Board* v. *King* [127 Ky. 824, 107 S. W. 247, 15 L. R. A. (N. S.) 379] *supra*: 'Neither by the Constitution nor the statute is it declared that the corporation shall be divested of, or the state vested with; the title to such useless lands immediately upon the expiration of the five-year period. Nor does either contain any prohibition against the sale or conveyance by the corporation after that date. The absence, however, of such a restriction, is not inconsistent with the right of the state to claim an escheat of the property at the end of the five years. It may upon the expiration of that period immediately take steps to enforce its right to the property, and thereby defeat any subsequent attempt at a sale and conveyance of it by the corporation.' Manifestly, nothing short of deprivation of the useless property can be expected by the corporation, if it violates the law by holding it more than five years and until suit to escheat it is instituted. The statute is as emphatic in its provisions that the school board shall be the beneficiary of the judgment of escheat, as is section 192 of the Constitution, that deprivation of the property shall be the penalty for the illegal holding of it by the corporation prohibited by its provisions. The purpose of the penalty of escheat is twofold: (1) It is an incentive to the corporation to sell its useless lands within the five-year period, without which it would not be diligent in disposing of them, and might not do so at all. (2) It is also an incentive to the school board to be diligent in discovering what corporations are illegally holding lands. To allow the offending corporation to retain the lands or their proceeds following their escheatal upon payment of the costs of the action would be to remove or mitigate the penalty and condone the offense, which the courts are without power to do. When the escheat is adjudged, the corporation's deprivation of the property escheated must inevitably follow, and it automatically falls to the school board. The statute so disposed of it, and the courts cannot divert it from its course."

In other words, a private corporation, when it acquires property in violation of law, secures title as against the seller or grantor in the conveyance or instrument by which the title is devolved. But the state has the right to step in and take from the corporation the property it so acquired. In some of our statutes it has been expressly provided that the proceeds of the property shall be divided among the stockholders; for instance, in prohibiting the ownership of agricultural lands for farming purposes. But the statute we are now dealing with expressly provides that a corporation shall own certain property, but no other. This is a prohibition against the ownership by the corporation, which the state had full power to make, and the effect of it is to incapacitate the corporation to acquire the property as against the state.

In construing the Mortmain Statute in *Blackbourn* v. *Tucker et al.*, 72 Miss. 735, 17 So. 73, the court held that the effect of the provisions of the Constitution was to prohibit the corporation from acquiring and the owner from making such disposition of it. The court said:

"The prohibition is against the thing to be done, and not against the processes by which it is done. The limitation is upon testamentary power, and, if it is unjust or retroactive to apply its terms to one who had made a will, why does not the same objection lie in favor of all the people who, at the time of the adoption of the Constitution, had the testamentary capacity to then make wills? The provisions certainly, in one sense, take away a pre-existing power, but it was one existing as much in every citizen then having testamentary capacity as in Blackbourn, who had executed a paper which in no sense bound him, or conferred any right upon the persons named therein as legatees. We can see no reason why the prohibitions should not operate against Blackbourn's right to retain his estate during his life, and then disinherit his heirs by devoting it to religious and charitable purposes, which would not also restrain it as against all others who, before the adoption of the Constitution,

had the power so to do. We are of opinion that the will is subject to the operation of the Constitution."

Much that has been said would be necessary to the decision of the case, but in view of the statements in the opinion of the majority (which are also unnecessary to the decision of the case, and therefore constitute dicta) I have deemed it proper to challenge such announcements so that no one will be misled thereby.

As stated in the beginning, Miss Wood, who is known in her religious life as Sister Imelda, inherited the property, has a right to own it, and a right to dispose of it in a lawful way. No doubt, the Bishop of the Natchez Diocese would dispose of it as directed in the will within some time deemed by him proper, but his judgment cannot in the nature of things, be the judgment of the law. The court below should therefore have retained the bill and directed a disposition of the property at such time as, in the light of the facts before it, would be proper.

In view of the exhibits to the bill and the admitted relations between the Sisters of Mercy, Sister Imelda, and the Bishop of the Diocese of Natchez, I think the bishop should not act as trustee in such case, and that therefore, the bill should have been retained, and a proper trustee, subject to the jurisdiction of the court, appointed with directions to sell.

I regret the necessity of discussing these questions at such length. I appreciate the great works of charity so worthily performed by the Sisters of Mercy, and recognize that, in many cases, a devotion of money to such society would serve a more useful purpose than turning it over to individuals. Nevertheless, the public policy of the state in restricting the ownership of property by religious corporations and societies is wholesome, as has been demonstrated in the history of other countries where such ownership has been permitted without restrictions, and it is the duty of the court to carry out the public policy of the state as expressed in its Constitution and laws, regardless of personal opinion or private wishes.