ESTATE OF CHARLES J. BARRY, DECEASED, THE HIBERNIA BANK, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76719.    Filed May 10, 1960.

*Clarence E. Musto, Esq.*, for the petitioner.

*John O. Hargrove, Esq.*, and *Aaron S. Resnik, Esq.*, for the respondent.

WITHEY, *Judge:* Respondent determined a deficiency in estate tax of $46,414.27. The sole issue is whether on the facts presented a bequest to decedent's son, Joseph F. Barry, a Roman Catholic priest and member of the Society of Jesus who has taken his final vows of absolute poverty in that society, is the equivalent of a transfer to or for the use of a religious corporation within the meaning of section 2055(a)(2), I.R.C. 1954.

#### FINDINGS OF FACT.

The stipulated facts are found.

Petitioner is the duly appointed executor, under a will dated December 19, 1947, of the estate of Charles J. Barry, who died September 10, 1955. Petitioner filed an estate tax return December 7, 1956, with the director of internal revenue for the first district of California.

Decedent was survived by a son, Joseph F. Barry, a member of the Jesuit Order, and three other sons and three daughters. Each daughter was a nun and a member of the Dominican Order of the Roman Catholic Church in the United States. All of the children were at the time of his death over 21 years of age.

Decedent left a will which he had executed on December 19, 1947. In it he devised the residue of his estate after specific bequests to each of said children equally, naming one of his sons therein "Joseph F. Barry, S.J." Joseph became a novice of the Jesuit Order, a Roman Catholic religious order, during September of 1935 when he was about 18 years of age and he has continuously remained a member of that order to the present time. At all times material hereto the California Province of the Society of Jesus has been and is a corporation described in section 2055(a)(2), I.R.C. 1954, gifts to or for the use of which are deductible from the gross estate of the decedent under that section.

On September 8, 1937, Joseph took the first perpetual vows of the Jesuit Order and thereafter on June 4, 1949, was ordained a priest of the Roman Catholic Church. Under the canon law of the Roman Catholic Church and the rules and regulations of and canon law governing the Society of Jesus, such vows imposed upon Joseph the condition of absolute poverty and require that although retaining ownership of his goods and the capacity of acquiring other goods of the kind "which constitute * * * [his] patrimony, or capital, or appertain to it from the nature of the goods, or the intention of the donor, or any other particular reason. All other goods * * * accrue to the Society." Any earnings of Joseph were to belong to the Jesuit Order and, prior to the taking of his first vows, he was required to transfer the administration of any property possessed by him to any person whom he might desire and dispose himself of its use and usufruct. On August 14, 1952, Joseph executed his renunciation and on the next day took his final perpetual vows in the Jesuit Order. Upon executing such renunciation and the taking of his final vows he was required by the canon law of the Roman Catholic Church and the canon law and rules and regulations of the Jesuit Order to and did renounce absolutely all of his rights with respect to property then owned by him or thereafter to come into his possession or ownership. He agreed that thereafter whatever goods might devolve to him either by donation or legacy are to be acquired by the society."

The canon law considers the final perpetual vows as the act whereby the individual is incorporated into the religious institute. By this incorporation the individual assumes rights and obligations to the order and the order assumes rights and obligations to the individual. Joseph's incorporation into the Society of Jesus took place at the time when he executed his final renunciation and took his final vows in August 1952. According to the canon law the mutual rights and obligations of Joseph and the Jesuit Order were settled at that time. The order had completely assumed all obligations for the support of Joseph at the taking of his final vows.

Decedent Charles Barry was a lifelong member of the Roman Catholic faith and at the time of execution of his will knew of the status of his various children in that faith and its several institutions. He believed that any property left by him to Joseph would ultimately be transferred by Joseph outright to the Society of Jesus provided Joseph was still a member of that society at the date of decedent's death.

In 1948 decedent had transferred 200 shares of stock of the Hibernia Bank to Joseph, who transferred possession of them to the rector of Alma College, where he was then located, and in 1952 transferred title to such shares to a Jesuit high school where he was then teaching. In June of 1952 decedent donated to Joseph 250 shares of stock of the Hibernia Bank, which Joseph in turn donated to the Loyola High School of Los Angeles, California, a Jesuit school. On January 24, 1948, Joseph transferred 7 $100 war bonds to the California Province of the Jesuit Order and on June 7, 1949, 20 $100 war bonds were so transferred by him.

In a prior will executed by decedent he had bequeathed the residue of his estate equally to each of his seven children except that to those of his children who were in religious orders, their shares were left in trust with the remainder of the trust estate to devolve to the children who were not members of a religious order. The final will, the terms of which are here in controversy, was executed by decedent with an intention to divide the residue of his estate equally among all of his children. He thought of Joseph and his sisters who were nuns and his other sons who were not members of religious orders as being similarly situated and that they would be entitled to their shares in his estate if they survived him but that the shares of those belonging to religious orders would have to pass to those orders because of the vows taken by those of his children belonging thereto. He did not intend to bequeath any property directly to those orders or to the Society of Jesus.

Upon distribution to him of his share of the residue of his father's estate, Joseph forthwith and in accordance with the canon law governing the Roman Catholic Church and the Society of Jesus, transferred such share to the society.

The bequest to Joseph was not a bequest or legacy to or for the use of a religious corporation within the meaning of section 2055(a)(2), I.R.C. 1954.

#### OPINION.

The facts in the case before us are so nearly identical to those in the *Estate of Margaret E. Callaghan*, 33 T.C. 870, as to be controlled thereby. In fact the Findings of Fact here are but a para-

phrase of the facts found in that case. This Court's discussion of the law in that case is dispositive of every issue here raised. On the authority of *Estate of Margaret E. Callaghan, supra*,

*Decision will be entered for the respondent.*