**ESTATE of Charles J. BARRY, Deceased,
The Hibernia Bank, Executor,
Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 17087.**

United States Court of Appeals
Ninth Circuit.

Dec. 3, 1962.

Morrison, Foerester, Holloway, Sherman & Clark, Clarence E. Musto, and Franklin C. Latcham, San Francisco, Cal., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Michael I. Smith, Gilbert E. Andrew, Charles Owen Johnson, Attys., Tax Div., Dept. of Justice, and Crane Hauser, Chief Counsel, I. R. S., Washington, D. C., for respondent.

Before POPE, JERTBERG and KOELSCH, Circuit Judges.

POPE, Circuit Judge.

This is a petition to review a decision of the Tax Court upholding a determination of deficiency in estate tax and holding that the value of the bequest hereafter described was properly a part of the gross estate for estate tax purposes.

The facts in this case are set forth in the Tax Court's findings and opinion, (reported at 34 T.C. 160) which, omitting a finding as to an earlier will, v.., reproduce as follows:

"Petitioner is the duly appointed executor, under a will dated December 19, 1947, of the estate of Charles J. Barry, who died September 10, 1955. Petitioner filed an estate tax return December 7, 1956, with the director of internal revenue for the first district of California.

"Decedent was survived by a son, Joseph F. Barry, a member of the Jesuit Order, and three other sons and three daughters. Each daughter was a nun and a member of the Dominican Order of the Roman Catholic Church in the United States. All of the children were at the time of his death over 21 years of age.

"Decedent left a will which he had executed on December 19, 1947. In it he devised the residue of his estate after specific bequests to each of said children equally, naming one of his sons therein 'Joseph F. Barry, S.J.' Joseph became a novice of the Jesuit Order, a Roman Catholic religious order, during Septem-

ber of 1935 when he was about 18 years of age and he has continuously remained a member of that order to the present time. At all times material hereto the California Province of the Society of Jesus has been and is a corporation described in section 2055(a) (2), I.R.C. 1954, gifts to or for the use of which are deductible from the gross estate of the decedent under that section.

"On September 8, 1937, Joseph took the first perpetual vows of the Jesuit Order and thereafter on June 4, 1949, was ordained a priest of the Roman Catholic Church. Under the Canon law of the Roman Catholic Church and the rules and regulations of and Canon law governing the Society of Jesus, such [first] vows imposed upon Joseph the condition of absolute poverty and require that although retaining ownership of his goods and the capacity of acquiring other goods of the kind 'which constitute * * * [his] patrimony, or capital, or appertain to it from the nature of the goods, or the intention of the donor, or any other particular reason. All other goods * * * accrue to the Society.' Any earnings of Joseph were to belong to the Jesuit Order and, prior to the taking of his first vows, he was required to transfer the administration of any property possessed by him to any person whom he might desire and dispose himself of its use and usufruct. On August 14, 1952, Joseph executed his renunciation and on the next day took his final perpetual vows in the Jesuit Order. Upon executing such renunciation and the taking of his final vows he was required by the Canon law of the Roman Catholic Church and the Canon law and rules and regulations of the Jesuit Order to and did renounce absolutely all of his rights with respect to property then owned by him or thereafter to come into his possession or ownership. He agreed that thereafter whatever goods might devolve to him either by donation or legacy are 'to be acquired by the society.'

"The Canon law considers the final perpetual vows as the act whereby the individual is incorporated into the religious institute. By this incorporation the individual assumes rights and obligations to the order and the order assumes rights and obligations to the individual. Joseph's incorporation into the Society of Jesus took place at the time when he executed his final renunciation and took his final vows in August 1952. According to the Canon law the mutual rights and obligations of Joseph and the Jesuit Order were settled at that time. The order had completely assumed all obligations for the support of Joseph at the taking of his final vows.

"Decedent Charles Barry was a lifelong member of the Roman Catholic faith and at the time of execution of his will knew of the status of his various children in that faith and its several institutions. He believed that any property left by him to Joseph would ultimately be transferred by Joseph outright to the Society of Jesus provided Joseph was still a member of that Society at the date of decedent's death.

"In 1948 decedent had transferred 200 shares of stock of The Hibernia Bank to Joseph, who transferred possession of them to the rector of Alma College, where he was then located, and in 1952 transferred title to such shares to a Jesuit high school where he was then teaching. In June of 1952 decedent donated to Joseph 250 shares of stock of The Hibernia Bank, which Joseph in turn donated to the Loyola High School of Los Angeles, California, a Jesuit school. On January 24, 1948, Joseph transferred seven $100 war bonds to the California Province of the Jesuit Order and on June 7, 1949, twenty $100 war bonds were so transferred by him.

\* \* \* \* \* \*

"* * * The final will, the terms of which are here in controversy, was executed by decedent with an intention to divide the residue of his estate equally among all of his children. He thought of Joseph and his sisters who were nuns and his other sons who were not members of religious orders as being similarly situated and that they would be entitled to their shares in his estate if

they survived him but that the shares of those belonging to religious orders would have to pass to those orders because of the vows taken by those of his children belonging thereto. He did not intend to bequeath any property directly to those orders or to the Society of Jesus.

"Upon distribution to him of his share of the residue of his father's estate, Joseph forthwith and in accordance with the Canon law governing the Roman Catholic Church and the Society of Jesus, transferred such share to the Society.

"The bequest to Joseph was not a bequest or legacy to or for the use of a religious corporation within the meaning of section 2055(a) (2), I.R.C.1954."

The applicable statute, last above mentioned, in pertinent part reads as follows: "§ 2055. Transfers for public, charitable, and religious uses. (a) In general.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers * * * (2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propa-

ganda, or otherwise attempting, to influence legislation * * *."

Upon this review, petitioner urges that this testamentary gift, though not one "to" the California Province of the Society of Jesus, was nevertheless one made "for the use of" that charitable corporation. Petitioner's reliance is upon Marine Midland Trust Co. of Southern New York v. McGowan, 2 Cir., 223 F.2d 408. In that case a testator made a bequest "to the Sigma Nu Fraternity, Inc." It turned out that the fraternity was not incorporated, but shortly thereafter "Sigma Nu, Inc., Educational Foundation" was incorporated. Testator had been given erroneous information that the fraternity was incorporated when he made his will. The trial court held that since the officers of the unincorporated fraternity had designated a representative to solicit the bequest, who had made the representation, they had in effect promised to restrict the bequest to educational purposes, and this, it was held, "was sufficient to establish a constructive trust". The court therefore held in that case that a bequest had been made "for the use of" a corporation.[1]

Petitioner reasons that this also is a case involving a constructive trust; that Father Barry was by virtue of his vows and agreement with the Jesuit Order a constructive trustee of the sums bequeathed to him under this will. This argument is based primarily upon petitioner's construction of §§ 2223 and 2224 of the California Civil Code which pro-

1. The court disagreed with the majority decision in Delaney v. Gardner, 1 Cir., 204 F.2d 855. In that case, under circumstances considerably different from those in the Second Circuit case, the trial court found that the executors of a will "held the money for charities as constructive trustees and because the charities could compel compliance with Mrs. Monks' desires, then she had made charitable gifts deductible under [the then applicable section]." The court reversed that decision, rejecting the trial court's determination that deductibility could be predicated upon the existence of a constructive trust, saying that the section providing for the deduction was "ap-

plicable only to those gifts which pass by the terms of a testamentary instrument." One judge dissented, saying (p. 864): "But the statute also includes 'transfers * * * for the use of' charities, and to give these words additional meaning I think they should be construed to cover the transfer of money from an estate to a charity accomplished by the device of a constructive trust imposed by local law on a testamentary disposition because of a testator's reliance upon his legatee's agreement to hold the devise for the benefit of the charity." In the Marine Midland case, supra, the court expressly approved and adopted this reasoning of the dissenting judge.

vide as follows: "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Civil Code § 2223. "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Civil Code § 2224.

We cannot see that these sections add anything to the ordinary rules relating to constructive trusts. § 2223 cannot be made applicable here without doing something akin to begging the question. We take it for granted that by virtue of his taking the final oath of poverty and making the renunciations in connection therewith, in joining the Jesuit Order Father Barry entered into an enforceable contract that he would at least while a member of that Order transfer to it any property which he might receive, and that such an agreement would be enforceable in the civil courts. See St. Benedicts' Order of New Jersey v. Steinhauser, 234 U.S. 640, 34 S.Ct. 932, 58 L.Ed. 1512, and Cox v. C. I. R., 2 Cir., 297 F.2d 36, 37. But we cannot go along with the assumption that one who unlawfully fails to perform his contract to transfer property to another becomes an involuntary trustee of the property involved. O'Melia v. Adkins, 73 Cal. App.2d 143, 166 P.2d 298, 301.[1a] § 2223 says that the person there mentioned becomes an involuntary trustee "for the benefit of the owner". But who is the "owner" here? That is the question to be answered, and to apply that section in this case would be to assume the fact to be proven, namely, that the Jesuit Order was the owner.

Neither does § 2224 apply. That section contemplates something akin to fraud, mistake, undue influence, or the like. The words "other wrongful act" used in that section cannot refer to a mere breach of contract for in interpreting those words we must apply the doctrine of *noscitur a sociis*.

We are unable to find in the facts of this case any circumstances which would permit us to hold that this was a bequest to a constructive trustee so as to make the gift one "for the use of" the Jesuit Order. This conclusion on our part is strongly reinforced by the Second Circuit's decision in Cox v. C. I. R., supra, whose facts cannot be distinguished, we think, from those in the present case. As the Tax Court found here, the testator "believed that any property left by him to Joseph would ultimately be transferred by Joseph outright to the Society of Jesus provided Joseph was still a member of that Society at the date of decedent's death." [2]

---

[1a.] And at testator's death there had been no breach of contract.

[2.] The lawyer who drew the will which was executed in 1947 and before Joseph F. Barry took his final vows, testified that at the time of the drawing of the will he advised the testator that the property given to Joseph F. Barry would go to the Jesuit Order; that thereupon the decedent made a statement to him "to the effect that 'They are all my children and if they have joined orders and have signed vows, taken vows, it goes to the religious orders', and the children, having no exclusive control over it, that was all right with him." He also stated on cross-examination that the statement was "that if any of the members of his family who had joined religious orders had taken vows or made commitments or statements and signed papers in favor of those religious orders, that they should get the money; and if they got the money instead of the child enjoying it himself, that was all right with him, that is the way he wanted it."

We note that at the time of this conversation Joseph F. Barry had taken only his simple or novice vows under which, as a member of the Order, he could retain ownership of goods which constituted his patrimony or capital. We assume that it would be a permissible inference that the testator knew before the date of his death that Joseph F. Barry had taken his final perpetual vows under which he relinquished all property rights, present or future, and undertook to transfer all property which came to him to the Order.

We find it unnecessary to discuss whether the testimony of the attorney above referred to could properly be considered

No significance attaches to the fact that the will referred to "Joseph F. Barry, S.J.". We think those letters, commonly used in referring to a member of the Jesuit Order, have no donative significance here any more than would the letters "M.D." appended to the name of a legatee who happened to be a medical doctor. So far as this gift is concerned, it read as follows: "Twenty-second: All the rest, residue and remainder of my estate of every kind and character, real, personal and mixed, and wheresoever the same may be situate I hereby give, devise and bequeath as follows: * * * One-seventh thereof to my son, JOSEPH F. BARRY, S.J.". This was an explicit naming of Joseph F. Barry as the legatee. Nowhere is there any reference to Joseph F. Barry as a trustee, or to the creation of a trust, or any suggestion that Father Barry should hold as a trustee. We think that precisely applicable here are the words used by the court in Cox v. C. I. R., supra, as follows, (297 F.2d p. 38): "For the will explicitly named Lewis as the legatee. Its language was too plain for any occasion to resort to processes of construction to ascertain the object of the testatrix's intended bounty. The testatrix's subsequent knowledge of any obligations Lewis had incurred which might control the disposition of *his* property did not alter the fact that it was to Lewis that she made the bequest of *her* property. * *

The bequest was made not because of any representation to the testatrix that it would go to the Society. On the contrary, the will containing the bequest was made at a time when she expected that Lewis would be able to receive and retain the bequest. After she learned of Lewis' subsequent renunciation and assignment to the Society, there was no mistake or representation which induced her to leave her original bequest unchanged. Instead, she did so knowing, as she said in the letter to her attorney quoted above, that Lewis 'will be only too happy *to pass it on* to the order * *." (Emphasis supplied.) It was Lewis' renunciation and assignment which was to be the operative dispositive act—as the testatrix plainly recognized. She did not, as she readily might have done, by her will create any interest of any kind, equitable or legal, conditional or executory, in the Society."

█ It is significant here that the Tax Court has made the following finding with respect to the testator: "He did not intend to bequeath any property directly to those orders or to the Society of Jesus." This is a finding of fact notwithstanding the fact that it is an inference drawn from other proven facts and circumstances in the case. See Commissioner v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 1198–1200, 4 L. Ed.2d 1218,[3] and Griffith v. Gardner, 9

in construing the meaning or effect of the will.

3. "Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. * * * One consequence of this is that appellate review of determinations in

this field must be quite restricted. * * * Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' Fed. Rules Civ.Proc., 52(a). 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 92 L.Ed. 746]. The rule itself applies also to factual inferences from undisputed basic facts, id. [333 U.S.] at 394 [68 S.Ct. at 541], as will on many occasions be presented in this area. Cf. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609–610 [70 S.Ct. 854, 856, 857, 94 L.Ed. 1097]. And Congress has in the

Cir., 196 F.2d 698, 701. We are of the opinion that the Tax Court was justified in believing that the testator, though realizing that Joseph F. Barry would probably make a transfer of what he received under the will to the Jesuit Order, nevertheless wanted to leave it to his son to do that and did not want to ignore the son or to treat him any differently than he treated his other children by short-circuiting him and making the gift directly to the Jesuit Order. The record shows also that Joseph F. Barry was at liberty to leave the Jesuit Order at any time and still remain in good standing as a priest. What such a withdrawal would have done to his obligation to transfer his property to the Order is something which we need not here consider.[4]

In the same will the testator made numerous gifts to charitable institutions and of substantial sums. Those institutions included Mercy Convent, St. Mary's Hospital, National Catholic School of Social Service, Sisters of Charity, St. Louis, Sisters of the Society of Helpers, Sisters of the Holy Family, Star of the Sea Church, Jesuit Missions, Maryknoll Missions, St. Joseph's Monastery, and others. Thus the testator well knew how to make gifts to or for the use of charitable institutions.

We are of the opinion that the finding of the Tax Court that it was not intended to bequeath any property to the Society of Jesus is amply supported by the whole record and is not clearly erroneous.

We also think that the court in Cox v. C. I. R., supra, properly distinguished

that court's prior decision in the Marine Midland Trust Company case, on which the petitioner here relies, for in the latter case the finding that there was a constructive trust came from the terms of the will itself and from the circumstances which surrounded its execution. No such situation may be found here.

We therefore hold that the judgment of the Tax Court was correct and should be affirmed.

IT IS SO ORDERED.

---

most explicit terms attached the identical weight to the findings of the Tax Court. I.R.C., § 7482(a)."

4. Joseph F. Barry took his final vows on August 15, 1952. In making his final renunciation of property rights on August 14, 1952, he showed a degree of independence which is not reflected in the Tax Court's findings. Thus in stating that he gave the 250 shares of Hibernia Bank stock to Loyola High School he added the following proviso: "Loyola High School understands that these shares of stock are not to be sold at any time, but in case they are to be disposed of by Loyola

High School, they should revert to my brother James R. Barry (or his family) of the Hibernia Bank, San Jose, California." In disposing of 200 such shares to Brophy High School, he added the following: "Brophy High School understands that the above mentioned 200 shares are not to be sold at any time, and if after acceptance the stock is to be disposed of, it is to revert to my brother John T. Barry (or his heirs) of Belmont, California." He gave $1000 to his brother James R. Barry "to help in the support of Cecil Kyes (Mrs. Burbette Kyes) of San Jose."