ESTATE OF BERNARD J. McGUIRE, ERWIN J. McGUIRE, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6793–71.    Filed November 30, 1972.

Erwin J. McGuire, pro se.
*George W. Connelly, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in estate tax in the amount of $1,144.45. The only issue is whether the decedent's estate is entitled to a deduction under section 2055(a)[1] for the value of the remainder interest in a trust where the trustee was authorized to use the net income and "so much of the principal" as in his judgment "shall be necessary for the comfort of my sister, Mother M. Camilla of the Sisters of Mercy, Rochester, New York."

### FINDINGS OF ACT

Bernard J. McGuire (hereinafter referred to as decedent) died testate on April 16, 1968. In his will he named his nephew, Erwin J. McGuire (hereinafter McGuire), the executor of his estate. The will was admitted to probate, and letters testamentary were issued to

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect at the time of decedent's death, unless otherwise noted.

McGuire on May 21, 1968. At the time he filed the petition herein, he was a legal resident of Rochester, N.Y.

Article Fourth of decedent's will, executed November 17, 1967, is in pertinent part as follows:

I give and bequeath the sum of Five Thousand Dollars ($5,000) to my nephew, Erwin J. McGuire, in trust nevertheless, to hold, manage, invest and reinvest and to pay or apply the net income and so much of the principal as in the judgment of my said trustee shall be necessary for the comfort of my sister, Mother M. Camilla of the Sisters of Mercy, Rochester, New York. Upon her death, I direct my trustee to pay the balance of said trust remaining, if any, to the said Sisters of Mercy.

Mother M. Camilla (sometimes hereinafter Camilla), whose maiden name was Helen M. McGuire, was born on November 14, 1886. She became a member of the Sisters of Mercy (sometimes hereinafter the order) in 1906 and remained a member for 64 years, until she died on April 25, 1970.

Camilla spent most of her active life teaching in the various schools administered by the order. From 1949 to 1955, she served as Mother General, the order's highest official. She retired from active service in 1958 and spent her final years living in the order's infirmary at Rochester, N.Y. For elderly members of the order, the infirmary is operated along the lines of a nursing home. During this period her infirmities were the normal maladies of a person of advanced age.

As a member of the Sisters of Mercy, Camilla was required to take a vow of poverty, forever disclaiming the individual ownership of property. The order furnished her with shelter, food, clothing, and medical care but gave her no cash allowance. She was permitted to, and did occasionally, receive additional clothing and other gratuities from members of her family. Upon her death her personal effects were disposed of by other members of the order.

By reason of the vow of poverty, money willed to a member of the order is treated as "patrimony" and is placed in a special account. Because of her vow of poverty, it was necessary for Camilla to ask the permission of her superior to use the funds which became available under the terms of the trust created by the decedent.

For many years prior to his death, decedent gave Camilla cash and paid for supplemental clothing which amounted to approximately $20 per month. Prior to his death, decedent explained to McGuire that one of his objectives in providing in his will for the creation of the trust here in dispute was to arrange for these payments to continue after his death.

At the time of decedent's death in 1968, Camilla was confined almost continuously to her room in the infirmary. She could move about only with the aid of a "walker." She attended decedent's funeral in a wheel-

chair, and she left the infirmary on only two other occasions (for dental care) after he died. At the infirmary she was given the kind of care she would have received in any good nursing home. The same care would have been given to her, as to any other member of the order, regardless of whether she had a patrimony fund.

Although decedent allotted $5,000 in his will for this trust, only $4,783.75 was actually received by the trustee (McGuire). The money was placed in a savings account and bore interest computed quarterly.

During the life of the trust, the fund was disbursed for Camilla's benefit at about the same rate as money had been made available to her before decedent died. In addition, special disbursements were made of $250 to purchase a dishwasher for the infirmary, $600 to purchase a refrigerator for the infirmary, $230 for Gregorian masses, and $30 for a chair for Camilla's room. The total disbursements, including those for the major appliances, were made at the rate of $50 to $75 per month. At Camilla's death, the balance of $3,029.90 in the trust fund was paid to the order.

In decedent's estate tax return, a deduction for the charitable remainder was claimed in the amount of $4,223. In the notice of deficiency, respondent disallowed the deduction.

### OPINION

In order for the charitable remainder to qualify as a deduction under section 2055(a),[2] the trustee's power of invasion must be limited by a definite and ascertainable standard capable of being translated into terms of money. See *Merchants Bank* v. *Commissioner*, 320 U.S. 256 (1943); *Ithaca Trust Co.* v. *United States*, 279 U.S. 151 (1929). In determining whether the trustee's power meets this test, the intention of the testator as expressed in the language of the will is the controlling consideration.[3]

The standard governing the trustee's power of invasion in the instant case was that in his "judgment" the expenditure be "necessary for the comfort of my sister." Although the precise amount which decedent

---

[2] SEC. 2055. TRANSFERS FOR PUBLIC, CHARITABLE, AND RELIGIOUS USES.

(a) IN GENERAL.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, * * *

*     *     *     *     *     *     *

(2) to or for the use of any corporation organized and operated exclusively for religious, charitable, * * * or educational purposes, * * *

[3] The fact that Camilla had taken a vow of poverty and under that vow was not permitted to own property does not allow the transfer in trust to be treated as if made to the Sisters of Mercy. *Cox* v. *Commissioner*, 297 F. 2d 36, 38 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court; *Lamson's Estate* v. *United States*, 338 F. 2d 376, 378 (Ct. Cl. 1964); *Barry's Estate* v. *Commissioner*, 311 F. 2d 681, 685–686 (C.A. 9, 1962), affirming 34 T.C. 160 (1960).

intended to be used for this specified purpose was not expressly stated in terms of money, a long list of estate tax cases has held that an authorization to invade the corpus may be quantified where one of the standards for such invasion was the comfort of the life beneficiary—e.g., "that may be necessary to suitably maintain her in as much comfort as she now enjoys," *Ithaca Trust Co.* v. *United States, supra* at 154; "comfort and welfare," *Blodget* v. *Delaney,* 201 F. 2d 589, 591 (C.A. 1, 1953); "necessary * * * for her comfortable maintenance and support," *Hartford-Connecticut Trust Co.* v. *Eaton,* 36 F. 2d 710 (C.A. 2, 1929); "support, maintenance, welfare and comfort," *Estate of Mary Cotton Wood,* 39 T.C. 919, 920 (1963); "comfortable support and maintenance," *Estate of Lucius H. Elmer,* 6 T.C. 944, 946 (1946); "comfort and support," *Estate of Edwin E. Jack,* 6 T.C. 241, 242 (1946); cf. Rev. Rul. 54–285, 1954–2 C.B. 302.

In all these cases, the courts have held that the will was drafted with reference to the life beneficiary's habitual way of life and that the standard controlling the trustee's discretion was sufficiently fixed, objective, or measurable to permit a reliable prediction as to the amount of the invasion of the corpus. Since that amount was subject to computation, a deduction under section 2055(a) or the applicable provisions of prior law was held to be allowable.

On the other side of the line, where the standard for invasion is cast in more subjective or expansive terms or accompanied by directions to show liberality in providing for the life beneficiary, the opposite conclusion has been reached—e.g., "my said Trustee shall exercise its discretion with liberality to my said wife, and consider her welfare, comfort and happiness prior to claims of residuary beneficiaries," *Merchants Bank* v. *Commissioner, supra* at 258; "pleasure, comfort and welfare," *Henslee* v. *Union Planters Bank,* 335 U.S. 595, 598 (1949); "for any purpose which may add to her [the beneficiary's] comfort or convenience," *Seubert* v. *Shaughnessy,* 233 F. 2d 134, 135 (C.A. 2, 1956); "support, maintenance, welfare and comfort" with the addition "and for any other purpose which my trustees shall deem expedient, necessary or desirable for the benefit or use of my said sister," *Zentmayer's Estate* v. *Commissioner,* 336 F. 2d 488, 489 (C.A. 3, 1964). In these situations the courts have concluded that the amount of the invasion was not predictable with reasonable certainty and, therefore, no reliable value could be placed on the charitable remainder.

We think the trustee's power in the instant case was governed by the objective, previous station-in-life standard. The will refers to the life beneficiary as "Mother M. Camilla of the Sisters of Mercy, Rochester, New York," rather than by her maiden name. This indicates the

standard of comfort to be provided her by the trustee would be that required by a member of a religious order whose support was provided by the order and who had taken a vow of poverty. Had the decedent coupled the word "comfort" with the word "support," the power quite clearly would have connoted "the objective station in life standard," *Salisbury* v. *United States*, 377 F. 2d 700, 704 (C.A. 2, 1967).[4] However, if he had done that, the will might have been interpreted to authorize the trustee to reimburse the order for the shelter, food, clothing, and medical care which it was providing for her. We think the will, when read as a whole, limits the word "comfort" to encompass merely the payment of about $20 per month to Camilla. Under this standard the amount of the encroachment on the corpus was reasonably predictable.

When interpreting a provision in a decedent's will for purposes of section 2055, consideration must be given to how the provision would be treated under local law. *Salisbury* v. *United States, supra* at 707.[5] Our interpretation of decedent's will is consistent with local law. Under the New York cases, the previous station-in-life standard has been deemed implicit in will provisions for "care, support, and comfort," *In re Martin's Will*, 269 N.Y. 305, 199 N.E. 491, 495 (1936); "proper care, comfort, and maintenance," *Holden* v. *Strong*, 116 N.Y. 471, 22 N.E. 960, 961 (1889); "comfort and happiness," *In re Elmendorf's Estate*, 205 Misc. 543, 129 N.Y. S. 2d 370, 373 (Ulster County Surr. Ct. 1954). See also *Ithaca Trust Co.* v. *United States, supra* at 154; *Salisbury* v. *United States, supra* at 707; *Estate of Mary Cotton Wood, supra* at 923, all of which involved wills controlled by New York law.

Respondent emphasizes that the amount to be made available to the life beneficiary was left to the "judgment" of the trustee. But the trustee was not without standards to guide him; he was limited to the amounts "necessary" for her "comfort" in making distributions. The determination of the reasonableness and propriety of payments made by the trustee would depend upon substantially the same proof as is required in determining by decree the amount necessary to be paid. *In re Martin's Will*, 199 N.E. at 494–495. Moreover, a trustee "is bound in the absence of instructions to the contrary to administer his trust with an eye to the remainder interest as well as to the interest of the

---

[4] As the court correctly notes in *Salisbury* v. *United States*, 377 F. 2d 700, 704 (C.A. 2, 1967), "this interpretation is not limited to only those instances where these very words are used."

[5] In *Salisbury* v. *United States, supra,* the court stated (p. 704): "the deduction is allowed when the life beneficiary's power of invasion is made referable to his standard of living as of testator's death, either expressly, as in *Ithaca Trust Co.*, supra [*Ithaca Trust Co.* v. *United States*, 279 U.S. 151, 154 (929)], or by implication from 'such words as "comfort and support" * * * *if such interpretation* is consistent with applicable local law, and other terminology in the will or instrument does not require some different interpretation,' Rev. Rul. 54–285, 1954–2 Cum. Bull. 302. * * *"

# 366

life tenant. He cannot slight one interest for the benefit of the other; he must have scrupulous regard for the interests of both." *Blodget* v. *Delaney, supra* at 593–594. In the instant case, the trustee could not have properly favored Camilla over the interests of the order. He was further limited by the necessity that Camilla obtain the permission of her superior in the order, the remainderman, before she could use the moneys.[6] The order, as a practical matter, could control the distributions.

Respondent stresses that the trust fund was depleted by actually almost $1,800 over the 2-year period following decedent's death, i.e., at the rate of approximately $50 to $75 per month rather than $20 per month. However, as stated in our Findings, $850 of the money was used to buy a refrigerator and dishwasher for the infirmary maintained by the Sisters of Mercy Order, the remainderman of the trust, and $230 was contributed to the church for Gregorian masses. The only significant expenditure shown to have been made for Camilla personally was a chair which cost $30, and the testimony was that since she had taken a vow of poverty, all her personal effects—evidently including the chair—remained with the order for use by other members. The unusually large distributions, made for the benefit or with the consent of the order, involved in effect advance distributions to the remainderman. When adjustments are made for these major expenditures, the amounts received by Camilla did not substantially exceed $20 per month.

Since decedent's will established an objective standard for the invasion of the corpus for the life beneficiary's comfort, it permits the translation of the value of the charitable remainder as of decedent's death into terms of money. As we have stated, we think it contemplated a distribution to the life beneficiary at the rate of $20 per month. According to section 20.2055–2, Estate Tax Regs., the value of the remainder in such circumstances is to be computed in accordance with the rules stated in section 20.2031–7, Estate Tax Regs. See *Kate Froman Trust,* 58 T.C. 512 (1972). The deduction claimed in the estate tax return does not appear to have been made under those rules. Accordingly, to permit such a computation to be made,

*Decision will be entered under Rule 50.*

---

[6] The pertinent sentences in the stipulation are as follows:

"7. When money is willed directly to a member of the Sisters of Mercy, it is placed in a special account known as 'Patrimony.' To use this money, the Sister would have to request the permission of her Superior and indicate her purpose. However, since Mother M. Camilla was the life beneficiary of a trust, the entire fund remained in the hands of the trustee until her death, but she was still required by her Order to request permission from her superior to use the monies."